**UNITED STATES of America**

**v.**

**Karl R. HUBER, Defendant.**

**No. 77 Cr. 670 (CHT).**

United States District Court,
S. D. New York.

Sept. 21, 1978.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City, for the Government; George E. Wilson, Asst. U. S. Atty., New York City, of counsel.

Bohrer & Ullman, New York City, for defendant; Barry A. Bohrer, Elliot A. Taikeff, New York City, of counsel.

## MEMORANDUM

TENNEY, District Judge.

The defendant, Karl R. Huber, has moved to quash the indictments handed up against him by grand juries[1] of this district on grounds that those juries were selected by a process that constitutes a "substantial failure" to comport with the Jury Selection and Service Act of 1968 ("the Act"), 28 U.S.C. § 1861 *et seq.*; *id.* § 1867(d). Although this motion was originally proffered with seven other pretrial motions on January 11, 1978, logistical problems attending the analysis of computerized juror-selection records for this district required the Court to give the defendant repeated extensions to perfect his argument. The motion was finally submitted on August 24, 1978; the Government responded; and an evidentiary hearing was scheduled. Shortly before the date of the hearing, however, the defendant moved the Court to "postpone final consideration of this motion, and adjourn the related evidentiary hearing . . . until the conclusion of trial in this case, should those proceedings result in conviction." Affidavit of Barry A. Bohrer, sworn to September 8, 1978, ¶ 1 ("Bohrer Affidavit I"). The request was based on the defendant's admission that there is "reason to doubt the completeness of the methods employed" to obtain statistics offered in support of one prong of his attack on jury selection, *i. e.*, that people of Hispanic origin are impermissibly underrepresented in the jury panels of this district. *Id.* ¶ 8. The defendant stated that as a result of this methodological flaw he could not "at *this time* . . .

1. The defendant was first charged in a 53-count indictment filed September 12, 1977; a superseding indictment containing 42 counts was handed up on February 1, 1978, by a different grand jury. The substance of the charges and the reasons for the variation in counts are explained in this Court's Memorandum and Order dated May 3, 1978.

present persuasive, analytically valid evidence of the populations of the Southern District at large and of the jury pool." *Id.*

The Court conferred with both parties on September 11, 1978, the date on which the evidentiary hearing would have begun but for the defendant's request for postponement. On the basis of its initial review of the materials already submitted, the Court instructed the defendant to make an offer of proof concerning his allegations that Hispanic people are impermissibly underrepresented in the jury pool, to brief the pertinent law on the point, and to rebut the Government case presented in opposition to the various other challenged aspects of jury selection, *i. e.,* failure to maintain and preserve records, usurpation of judicial functions by the jury clerk, failure of the Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Southern District of New York ("the Plan") to comport with the Act, failure of the clerk to comply with the Plan, and constitutional impermissibility of the Act's residence requirement.

The defendant has now complied, and the Court concludes upon the information now before it that nothing could be gained by postponing the determination of this motion until after trial, that the defendant has not raised a colorable claim warranting a hearing, and that for the following reasons the motion to quash the indictments must be denied.

### Jury Selection Procedure in the Southern District

Pursuant to 28 U.S.C. § 1863(a), a "Reviewing Panel" consisting of the members of the Judicial Council of the Second Judicial Circuit of the United States and the Chief Judge of the Circuit adopted, on March 5, 1969, the instrument that now governs jury selection in this district.[2] The Plan tracks the Act in all respects. In the aspects pertinent to the matter at bar, the Plan provides that the "Clerk," defined as Clerk of the Court or the Deputy Clerk for juries ("Jury Clerk"), shall manage the jury selection under the supervision of the Chief Judge of the District Court ("Chief Judge"), Arts. I & II, *see* 28 U.S.C. § 1863(b)(1); affirms that the "Judges of the Court find that the persons whose names appear on the voter registration lists [of the eleven counties comprising the Southern District] for the last Federal or State general election represent a fair cross section of the community in the District," Art. III A; *see* 28 U.S.C. § 1863(b)(2); specifies "detailed procedures to be followed by the . . . clerk in selecting names" randomly from the voter registration lists which make up the pool from which jury lists are drawn, 28 U.S.C. § 1863(b)(3); and provides for a "Master Jury Wheel" into which the randomly selected names are placed. 28 U.S.C. § 1863(b)(4).

The "detailed procedures" outlined in the Plan result in the selection of jurors by the following method:

1. An estimate is made of the number of jurors who will be required for four years' service.

2. That number of names is drawn from county voter registration lists, each county list providing a portion of names in the same proportion as that county's registration list bears to the entire number of persons registered to vote from all eleven counties.

3. The drawing of names from the voter registration lists is accomplished through a combination of manual and electronic activities, a mode explicitly sanctioned by the Plan. Art. III A (d). The following method is prescribed: The total number of registered voters is divided by the number of jurors who, it is estimated, will be needed for the Master Jury Wheel. The product of that division is referred to as the "quotient." When that quotient is established,

---

2. The Plan is implemented through the United States Automated Jury Selection System, which was originally designed for the Eastern District of New York and which currently provides support to 17 United States District Courts consisting of 50 divisions. Of these 17 courts, 11 use similar distribution techniques as those employed for the Southern District. Affidavit of Michael Sutera, sworn to August 31, 1978, ¶ 2.

cards bearing numbers from one (1) to the quotient number are placed in a jury drum or box. The Jury Clerk then draws a number from that box to establish the "starting number" for selection from the voter registration lists. From that base line starting number, names are drawn off the voter registration lists at intervals equal to the quotient number until the four-year estimate is reached. The result is a "Master Jury List" which is placed in a "Master Jury Wheel."

From the Master Jury Wheel, the Clerk is to draw the names and addresses of those to whom questionnaires will be sent in order to make up grand and petit venires. This second selection—of "Qualified Jurors" to make up the "Qualified Jury Wheel"—is to be accomplished in substantially the same fashion as initial selection from the voter registration lists. The Plan mandates that "once or twice each year, or more frequently, if necessary, at times to be determined by the Chief Judge," the Jury Clerk use the same starting number and quotient system to draw names for the Qualified Jury Wheel based on the anticipated need for jurors for the next following period (plus a margin to compensate for unavailable or ineligible voters). At this point the Jury Clerk deviates from the Plan in practice, although not in substance. The Jury Clerk states that he knows through experience that "it is necessary to use one-eighth of the total master jury wheel every 6 months . . . in order to generate enough qualified jurors for the qualified jury wheel for use during that period." Affidavit of Clayton George Cornelius, sworn to August 30, 1978, ¶ 9 ("Cornelius Affidavit"). Therefore, instead of selecting qualified jurors from the Master Jury List every six or twelve months as needed, the Jury Clerk uses, for each six-month period, one of eight reels of Master Jury Wheel names prepared in advance by the Data Services Division of the Automated Data and Telecommunication Service, General Services Administration ("G.S.A."). Apparently these reels are prepared without the use of a "starting number," but the computer expert who supervises this procedure for the G.S.A. states that the computer is programmed to take "names according to the quotient of 8 (i. e., representing the 8 reels) by county from the entire master jury wheel and [to distribute] them into 8 groupings or reels." Affidavit of Michael Sutera, sworn to August 31, 1978, ¶ 10 ("Sutera Affidavit").

The defendant quarrels with this method, alleging that it deviates from the six-month-interval "random selection" envisioned in the Act because, inter alia, the "total number of names [in the Master Jury Wheel] are divided by G.S.A. into 8 equal divisions containing an equal number from each of the 11 counties in the District," and the Jury Clerk then selects one of these "quasi-alphabetized" divisions, or reels, for refinement into the Qualified Juror List for the next six months. Affirmation of Thomas R. Warman, submitted August 24, 1978, ¶ 20 ("Warman Affirmation").

What evil there can be in doing by computer in advance and in toto what might be done in smaller lots manually is difficult for the Court to see. Although the explanations of computer procedure from both sides are not particularly illuminating, apparently each county's voter registration list is processed for division into eight segments; in the processing the names are selected from these county lists at intervals that correspond to the direction for a "quotient number"; the eleven segments of one-eighth of each county's list are combined to make one reel; and one such combined reel serves as the pool from which qualified jurors are chosen for the next six-month period. Indeed, the method employed "results in exactly the same lists as if, in accordance with Article III C [of the Plan] the process had been performed on seven separate occasions—once every six months." Sutera Affidavit ¶ 10.

4. Once the qualified juror pool reel for the next six months is in the Jury Clerk's possession, the persons named on the list are sent jury qualification questionnaires. The completed questionnaires are returned to the Jury Clerk to be reviewed initially by him and "finally evaluated by the Chief Judge" for eligibility. Plan, Art. III C.

Those who are eligible for service constitute the final "Qualified Jury Wheel."

5. The Plan provides that the Chief Judge determine whether a person is "unqualified for, or exempt, or entitled to be excused from jury service" pursuant to criteria established elsewhere in the Plan. Art. VI.

6. Grand and petit juries are drawn from the same "Qualified Jury Wheel" although the names so drawn are then kept separately. Art. VII B, as amended. Those to be selected for service on particular grand or petit juries are drawn, as needed, from each list at random.

7. A juror may be excused by the Chief Judge "for such period as the Chief Judge deems necessary, at the conclusion of which such person, without his card having been reinserted into the Qualified Jury Wheel, shall be summoned again for jury service . . . or excluded" for various reasons. Art. VIII.

8. The Plan also provides, in language that tracks 28 U.S.C. § 1867(f), for confidentiality of the "contents of records or papers used by the jury . . . clerk in connection with the jury selection process," Art. X, except that "[t]he parties in a case, shall, upon application supported by affidavit, be allowed to inspect, reproduce, and copy such records or papers at all reasonable times in order to prepare and prosecute" a motion challenging compliance with the Act. *Id.*

9. Finally, Art. XI provides for the emptying and refilling of the Master Jury Wheel and for the retention of "records and papers compiled and maintained by the clerk before the Master Wheel was emptied," such records and papers to be preserved in the Jury Clerk's custody for four years.

### The Defendant's Challenges to Jury Selection

*Underrepresentation of Hispanics*

 The "main thrust" of this attack on the selection of grand jurors in this district alleges a "substantial underrepresentation of Hispanics—persons for whom Spanish is the native language or the native language of one or more parent—in the Southern District jury pool," *i. e.*, in the voter registration lists from which this pool is drawn. Defendant's Supplemental Memorandum at 1. The defendant has acknowledged that he cannot now support the statistical base upon which he rests this challenge. *See* Bohrer Affidavit I ¶ 8. Upon his offer of proof, however, he begins by alleging that some three percent of the Juror Qualification Questionnaires sampled showed self-designation as "Hispanic."[3] He contrasts this with the estimate of his demographer that the "percentage of Hispanics in the Southern District of New York eligible for service on juries in 1976 was 15 percent of the eligible population in the District." Affidavit of Barry A. Bohrer, sworn to September 15, 1978, ¶ 4 ("Bohrer Affidavit II"). He then adds that he tested the three percent figure by counting persons of Spanish surname within the sample, *id.* at 2 n.*, although he recognizes that this method is suspect "because a substantial number of persons with Spanish surnames are not of Spanish origin," and further, because the "Italian origin population within the Southern District is three times as great as that within the United States as a whole [and this population] is the largest single ethnic group with names that are the same or similar to Spanish surnames." *Id.* Taking into consideration both variables, he adjusts his Juror Qualification Questionnaire total Hispanic pool to reflect surname overlap and concedes a figure of 5.3 percent for the

---

**3.** The Court notes that the statistics submitted, already methodologically suspect, also do not account for the fact that the Juror Qualification Questionnaire asks only for a person's "race" and that the information need be given only on a voluntary basis. Cornelius Affidavit Appendix II. It is highly questionable whether most persons of Hispanic language background would interpret a racial question as calling for an ethno-linguistic response, and the permissive nature of the question casts further suspicion on the validity of the response.

number of Hispanics within the sample Juror Qualification Questionnaires. Id.[4]

Assuming then, for the purposes of this motion only, the validity of both bottom-line figures, *i. e.*, 5.3 percent Hispanics in the jury pool contrasted with 15 percent eligible Hispanics in the voting population of the district, the Court concludes that the failure of the district to attract more Hispanics into the jury pool by the use of sources other than voting lists does not represent a "substantial failure" to comply with the Act.

At the outset it is necessary to isolate exactly what is, and what is not, under challenge here. The defendant alleges that use of voter registration lists as the sole source of jurors in this district violates his right to a fair cross section of the community because Hispanics are underrepresented on voter lists and, a fortiori, on jury lists. The question is not, as has been so extensively argued, whether and in what measure a statistical underrepresentation on the jury lists raises a prima facie case of discrimination in jury selection, for we are here dealing one step further up the line with the voluntary and neutral process of registering to vote. Thus it is irrelevant that in *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), the Court found that the defendant was required to rebut a prima facie case of discrimination where there was a 40% dispari-

ty between the population of Mexican-Americans in the county and in the grand jury. *Castaneda* had its genesis in a grand jury "key man" selection system which "relies on jury commissioners to select prospective grand jurors from the community at large." *Id.* at 484, 97 S.Ct. at 1275. The statistics raised a prima facie case because the Court found the underrepresented group to be a recognizable, distinct class "singled out for different treatment under the laws as written or applied," and found a "significant" degree of underrepresentation established by "comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time," all in the context of "a selection procedure that is susceptible of abuse or is not racially neutral [and therefore] supports the presumption of discrimination raised by the statistical showing." *Id.* at 494, 97 S.Ct. at 1280.[5]

The defendant does not allege that voter registration in this district is "susceptible of abuse" or "not racially neutral." The bare issue before the Court is whether the purported disproportion between the Hispanic population in the district and those who register to vote and are therefore available for jury service deprives the defendant of his "fair cross section of the community" within the meaning of the Act. The Government need not, on this point, "rebut" any "presumption"; the statistical anomaly, if true, is not a fact susceptible of exculpa-

---

**4.** The figure for Hispanic population in the Southern District at large does not cull those who might be ineligible for lack of one-year resident status. 28 U.S.C. § 1865(b)(1). Moreover, there is no variable given for the number of Hispanics who might not have returned the Juror Qualification Questionnaire for the same lack of proficiency in English that would disqualify them as jurors under section 1865(b)(2). Significantly, the defendant does not state what percentage of registered voters are Hispanics, and he makes no claim that this percentage, no matter how it deviates from the estimated vote-eligible Hispanic population, exhibits a statistical anomaly when compared to the number of Hispanics on the Master Jury Wheel or to the number of Hispanics whose Questionnaires were sampled.

**5.** It is similarly irrelevant that in *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d

759 (1965), a 10% disparity was not considered prima facie discriminatory in a "key man" context; a 14% underrepresentation was sufficient to establish a prima facie case of systematic exclusion in *Jones v. Georgia*, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967), where veniremen were drawn by the jury commissioner from tax digests, two out of three of which were "separated and identified as to race," *id.* at 25 n.*, 88 S.Ct. at 5; and in *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), the Court struck down a state provision that excluded women from jury service unless they had affirmatively declared their willingness to serve. All these cases have in common a demonstrated or potential opportunity for manipulation of the seminal source from which the jury pools were eventually drawn; no such opportunity for abuse at the source level exists under this district's Plan.

tory rebuttal: it is the Court's obligation to determine whether, as a matter of law, the substantial failure of a distinguishable group to make itself available for jury service represents a cognizable violation of the Act. A reading of the Act, its history and the pertinent case law convinces the Court that it is not.

The Act expresses twin policies, one affording the defendant the right to grand and petit juries selected at random from a "fair cross section of the community in the district . . . where the court convenes," and the other mandating that "all citizens . . . have the opportunity to be considered for service on grand and petit juries in the district courts of the United States." 28 U.S.C. § 1861. Voter registration lists are the primary source of veniremen, *id.* subsection 1863(b)(2), but "[t]he plan shall prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections 1861 and 1862." *Id.* The legislative history admonishes that "any substantial percentage deviations [in the voter or voter registration lists] must be corrected by the use of supplemental sources"; the definition of "substantial" is left "to the process of judicial decision." H.R.Rep. No. 1076, 90th Cong., 2d Sess. (1968), *reprinted in [1968] U.S.Code Cong. & Admin.News*, pp. 1792, 1794. The Act itself does not differentiate between substantial deviations rooted in impermissible or benign causes, nor does it favor one of its expressed policies over the other.

However, the legislative history does make clear the reasons for using voter registration lists as the primary source of juror names. "These lists provide the widest community cross section of any list readily available. Census data quickly become out of date and are not suitable." *Id.* Moreover, voter lists are "[t]he initial line of defense against incompetence" among jurors because they "contain an important built-in screening element in that they eliminate those individuals who are either unqualified to vote or insufficiently interested in the world about them to do so." *Id.* at 1795–96. Significantly, the history states:

> In a sense the use of voter lists as the basic source of juror names discriminates against those who have the requisite qualifications for jury service but who do not register or vote. This is not unfair, however, because anyone with minimal qualifications—qualifications that are relevant to jury service—can cause his name to be placed on the lists simply by registering or voting. No economic or social characteristics prevent one who wants to be considered for jury service from having his name placed in the pool from which jurors are selected.

*Id.* at 1794–95. While this comment does not directly address how excluding the voluntarily disenfranchised bears on the defendant's right to a "fair cross section," it does suggest recognition that the paradigm is best composed of those who exhibit enough concern for the political and, a fortiori, the judicial process to exercise their privilege of citizenship.

Nevertheless, the defendant insists that the district has an affirmative duty under section 1863(b)(2) to supplement the voter lists now in use. He fastens on that portion of the legislative history that "recognizes that in some areas voter lists of all kinds may be insufficient to implement the policies of the act, by reason of local voting practices." *Id.* at 1799. However, when this passage is read with the statement that exclusion of those who voluntarily fail to register is not "unfair," it and its statutory analog, section 1863(b)(2), appear to focus on the occasional community where the opportunity to register, vote and be listed is itself impermissibly circumscribed. Our court of appeals reached the same conclusion in *United States v. Guzman*, 468 F.2d 1245 (2d Cir. 1972), *cert. denied*, 410 U.S. 937, 93 S.Ct. 1397, 35 L.Ed.2d 602 (1973). The court found that section 1863(b)(2) is directed at "districts where obstacles are placed in the paths of certain citizens attempting to register to vote [and] the voting rolls must be supplemented to achieve a list reflecting a fair cross section of the community." *Id.* at 1248.

In *Guzman*, the defendant challenged the lack of supplementation where the voter lists of this district were claimed to under-represent youth between the ages of 24 to 30. The *Guzman* court refused to find that exclusive use of registration lists violated the Act, for "in the Southern District, where the asserted . . . group is entitled to register and vote and has done so (albeit in lower proportion than its percentage of the total population), we can find no systematic discrimination sufficient to require the use of alternative sources for jury lists." *Id.* *Guzman* is still the controlling authority on this matter, despite the comment made in *United States v. Fernandez*, 480 F.2d 726 (2d Cir. 1973), that

> [w]hether . . . affirmative measures [to supplement voting lists] are necessary only when there is evidence of "systematic discrimination" in the composition of the voting lists or also when voluntary voting patterns create a statistical deviation from the cross-section of the community seems to have created a difference of opinion among courts which have considered the problem.

*Id.* at 733 n.12, *citing, inter alia, Guzman.* It is now clear that the great weight of decision has resolved this question in harmony with the expressed opinion of the Congress that the voluntarily self-excluded, whether or not they are linked by some sociologically valid commonality, are irrelevant to the policies of the Act. *Guzman, supra. See Murrah v. State of Arkansas,* 532 F.2d 105 (8th Cir. 1976) (the unregistered and non-voting in general); *United States v. Freeman,* 514 F.2d 171 (8th Cir. 1975) (American Indians); *United States v. Lewis,* 472 F.2d 252 (3d Cir. 1973) (Blacks); *United States v. Ross,* 468 F.2d 1213 (9th Cir. 1972), *cert. denied,* 410 U.S. 989, 93 S.Ct. 1500, 36 L.Ed.2d 188 (1973) (young people); *United States v. James,* 453 F.2d 27 (9th Cir. 1971) (Blacks and poor people); *Camp v. United States,* 413 F.2d 419 (5th Cir. 1968), *cert. denied,* 396 U.S. 968, 90 S.Ct. 451, 24 L.Ed.2d 434 (1969) (religionists with scruples against voting); *United States v. Gaona,* 445 F.Supp. 1237 (W.D. Texas 1978) (Mexican-Americans).

The defendant has cited no case in which a neutral, voluntary compilation of voters and registrants has been found inadequate to meet the mandate of the Act because a particular group regularly and persistently fails to take the necessary step to be listed.[6]

---

**6.** The defendant proffers *United States v. McDaniels,* 370 F.Supp. 298 (E.D.La.1973), which has facts similar to those at bar. The *McDaniels* defendants alleged that the voter lists from which jurors were drawn substantially underrepresented Blacks and poor; ergo, did not provide the mandated "fair cross section" and were in need of supplementation from sources that would add members of the underrepresented groups. The court denied the challenge because the selection plan did not "in the final analysis . . . result in a substantial underrepresentation of black persons and because the Jury Selection Act of 1968 does not require that the voters list . . . constitutes a cross section of the various strata of the population classified according to income status." *Id.* at 301. Before reaching that conclusion, the court stated: "Whether or not [members of the underrepresented cognizable group] who have not registered, for whatever reason, or indeed without reason, are 'at fault' for failing to exercise their franchise is immaterial; the right protected by the statute and called into question here is the right of the defendant to be tried by a fairly constituted jury." *Id.* at 301–02.

This dictum is seized upon to support the thesis that the Court is obliged to focus on the data demonstrating underrepresentation of Hispanics on voter registration lists, determine whether the paucity of Hispanic voters—hence, jurors—is "substantial," and, if so, order supplementation of the voter lists. There is no need to measure the "substantiality" of the deviation asserted by the defendant, for this Court's analysis of the rationale supporting use of voter lists as the exclusive source of potential juror names in the Southern District is at odds with the *McDaniels* dictum. *McDaniels* did not consider any of the legislative materials that dismiss nonregistrants or nonvoters from consideration in the implementation of the Act's policies; moreover, the cited passage is weakened by a later statement in the same case that "[i]t does not necessarily follow that a jury plan is invalid under section 1861 if, upon examination of the voter lists, it is discovered that 10% of the adult population is of Irish descent, or that 6% of the population is Jewish, but that, because of failure to register to vote, each group is underrepresented by 30% on the voting list." *Id.* at 308.

Defendant also looks to *United States v. Armsbury,* 408 F.Supp. 1130 (D.Or.1976), where the

Notwithstanding the arguments of respected commentators to the contrary, *see, e. g.,* Kairys, Kadane & Lohoczky, *Jury Representativeness: A Mandate for Multiple Source Lists,* 65 Cal.L.Rev. 776 (1977), the Court concludes that use of juries derived from the voter lists of this district afford the defendant a "fair cross section of the community" within the meaning of the Act and that in this district the use of voter lists as the sole source of grand jurors fully complies with the Act.

*Maintenance and Preservation of Records/"Public" Procedures*

■ Both the Act and the Plan require the maintenance and availability of records or papers used by the Jury Clerk in connection with the jury selection process "in order to aid parties in the 'preparation' of motions challenging jury-selection procedures." *Test v. United States,* 420 U.S. 28, 30, 95 S.Ct. 749, 750, 42 L.Ed.2d 786 (1975). Furthermore, Master Jury Wheel records must be maintained for four years after the life of the wheel has ended. 28 U.S.C. § 1868. The defendant charges that "the Jury Clerk for the Southern District of New York does not maintain and preserve the records of all transactions involved in the jury selection process under the present General Services Administration Automated System," Defendant's Memorandum at 4, and details instances of derelictions that, he contends, have deprived him of a "meaningful opportunity to determine whether his right to grand juries 'selected at random from a fair cross section of the community' has been violated." *Id.*

There is no merit in any of the defendant's contentions. Much of which he complains has its genesis in the realities of computerization. For example, it is true that some interim working documents technically "used" in the jury selection process at the G.S.A. are not kept by the Jury Clerk as "records or papers" used by him within the meaning of the Act or Plan. These are not now available to the defendant. However, by his own characterization, the defendant has been supplied with "voluminous" documents from the G.S.A., Warman Affirmation ¶ 7, and these documents include a printout of the computer console sheets (which are a record of all computer transactions requested by the Jury Clerk), and a sample run of the Master Jury Wheel. He has also been given access to the Juror Qualification Questionnaires. Thus, while the defendant insists that failure to maintain interim records for a full four years after the Master Jury Wheel lapses violates the Act and his rights in a "substantial" way, the Court disagrees. The Act itself provides that the term "jury wheel" include "any device or system similar in purpose or function, such as a properly programmed electronic data processing system or device," 28 U.S.C. § 1869(g); certain leeway for computer technology must be granted as long as the end product, the completed Master and Qualified Juror lists, are available to the defendant. The Supreme Court has equated the "records or papers" contemplated by section 1867(f) with "jury lists." *Test v. United States, supra,* 420 U.S. at 30, 95 S.Ct. 749. In view of the defendant's acknowledgment that he could "inspect and copy the juror qualification forms for the master and qualified jury wheels, . . . obtain a list of the names and addresses of the jurors in the master and qualified jury wheels, and . .

court rejected outright this court's analysis that nonvoters and/or nonregistrants are irrelevant to the matter of fairly cross-sectional juries. Relying in part on *McDaniels* the *Armsbury* court stated, *inter alia,*

> I believe that § 1861 [that is, the legislative history ratifying exclusion of those on voter lists] merely indicates that non-voters do not form a cognizable group. It does not mean that voting lists are always adequate when free from discrimination in voter registration. The voting list is not the end sought but only

the means used to ensure that all cognizable groups within the populace are represented on juries. The voting list cannot be adequate if some groups are significantly underrepresented, regardless of the cause.

*Id.* at 1140. However, in *Armsbury* all alleged underrepresentations in the voter list were deemed insubstantial on one ground or another, and the challenge to the jury selection system fell. This Court finds *Armsbury,* like *McDaniels,* unpersuasive.

poll the jurors in such wheels," Warman Affirmation ¶¶ 9 & 10, it is not a substantial failure to comply with the Act that "other than the initial and final wheel tapes, no other documentation [of the computer programming] is preserved for any period approaching 4 years." *Id.* ¶ 12.[7]

██ Notwithstanding the material available and received, the defendant alleges that the Jury Clerk, through his "agent" the G.S.A., violated the Act in a particularly grievous manner by failing to retain the cumulative Master Jury Wheel tape for the 1972–1976 period. The defendant argues that without this tape the Jury Clerk could not give him the names and addresses of 21,672 persons who were sent questionnaires but were "eliminated prior to qualification," perhaps for death, excuse, exemption, disqualification, return of misdirected questionnaires, or, more ominously, for reasons of "human intervention." However, the defendant elsewhere cites the same figure of 21,672 as " 'in process' at the discontinuance" of the 1972–1976 wheel. Bohrer Affidavit II ¶¶ 7, 10(c). Obviously the 21,672 names alluded to were merely part of the excess of the number it was necessary to screen in the four-year period. The Jury Clerk is required by the Plan to *estimate* the number that will be required for the four coming years—exactitude is not required. For the period 1972–1976, he estimated that the district would need a Master Jury Wheel of approximately 296,000 persons, and he had overestimated by some 74,000. Warman Affirmation ¶ 22. Of these 74,000, some 21,672 had been sent questionnaires that were never processed because the wheel lapsed before they were needed. There is nothing suspect in this event. Moreover, while the defendant complains that all 74,000 persons "should have had an opportunity to serve [and] were never given an opportunity to qualify," *id.*, the Court disagrees. Whether the excess in the Master Jury Wheel languished uncontacted or had already received and even returned a questionnaire prior to the moment that their eligibility ended with the end of the four-year period, there is no requirement that all those in the Jury Clerk's initial calculation be interviewed for jury service, or that he keep records of those who had not yet been processed when the wheel lapsed. In effect, those who were in the overage only as a result of the too-generous estimate of the Jury Clerk were in the same position as those whose names were never taken from the voter registration lists at all. In view of the neutral procedures employed in selecting what proved to be a superabundance of names from the voting lists and of the use of the same neutral procedure in dividing the names into reels to be used in compiling the Qualified Juror Wheel, there is no reason to believe that the unprocessed names—contacted by questionnaire or not—presented anything other than the same cross section as the portion used, or that their "elimination" from consideration was the result of anything other than the statutory lapse of the Master Jury Wheel. Even if that wheel originally contained all names selected according to the inflated juror-requirements estimate, the Court does not find substantial failure to comply with the Act in the destruction of materials superfluous to the record of the jury pool as it was actually contacted and winnowed for use in the district.

██ There is no more merit in defendant's related argument that the Jury Clerk fails to hew to the Act and Plan because he does not conduct his jury selection "publicly" as mandated, *inter alia*, by 28 U.S.C. § 1864(a). The defendant alleges, for example, that "the initial stages of the selection process, including the drawing of 'starting numbers' were conducted in the privacy of the Clerk's office." However, as the defendant also states, "the policy objective that selection procedures be rendered 'publicly' is served by the opportunity for

---

**7.** The Jury Clerk states that he "maintains a complete set of computer console sheets going back to the beginning of the master jury wheel" with the exception of one sheet "either lost of mis-filed." Cornelius Affidavit ¶ 5 and n.*. These, too, were available to the defendant.

public access to records which reflect the process." Defendant's Memorandum at 4–5. The Court cannot find that the failure to retain the minutiae detailing the "process" by which jurors are selected, e. g., the interim programming materials for the computers, the mathematical calculations made by the Jury Clerk in devising the quotient and starting numbers, etc., constitutes an affront to the policy of providing the adequate memorialization of juror selection that satisfies "public" scrutiny. There is no substantial failure to comply with the Act because of the minor deviations occasioned by the use of electronic equipment, or by the failure of the Jury Clerk to maintain a record of his ministerial act in selecting quotient and starting numbers, or by failing to perform any of these operations before public eyes. In *United States v. Davis*, 546 F.2d 583 (5th Cir.), *cert. denied*, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977), the defendant complained of a lack of public access to the G.S.A. computer room where the local plan—in contrast to this district's Plan—actually mandated public notice of and access to automated drawings. The *Davis* court rejected the challenge, noting that a "substantial failure" to comply with the Act must allege more than a mere "technical" deviation or even a number of them. *Id.* at 589.

### Usurpation of Judicial Functions by Jury Clerk

■ The defendant alleges that the district does not comply with its own Plan and with the Act because the Jury Clerk, and not the Chief Judge, determines who among those called for jury service is qualified for, exempt from, or excused from service, and that he likewise usurps the Chief Judge's function by granting postponements. *See* Plan Art. VI. With the exception of one discretionary exemption category, *i. e.*, "persons as to whom the Chief Judge finds for reasons other than the foregoing that jury service would constitute undue hardship or extreme inconvenience," Art. V, the other criteria consist of eight well defined, objective status exemptions mirrored in check-off boxes on the Juror Qualification Questionnaire. It would be an absurd waste of judicial manpower to require the Chief Judge to abstract this information from the questionnaires or to monitor the Jury Clerk as he does so, and the implied delegation of this ministerial task to the Jury Clerk in no way constitutes a "substantial failure" to comply with the Act. Insofar as the prospective juror claims "undue hardship or extreme inconvenience," such requests are "made to the Chief Judge or to the judge who impanels the jurors on the day they are summoned to report." Cornelius Affidavit ¶ 14.

With regard to postponements, the Chief Judge has delegated to the Jury Clerk the authority to grant temporary postponements for up to one year. *Id.* ¶ 13. The Clerk retains the names of "postponed" jurors, reinserting the name for the month in which he or she can serve. *Id.* ¶ 15. Whether or not, as the defendant alleges, the Jury Clerk could reinsert "postponements" immediately into the automated system and have the names called by the computer at the time when they will be available, the Jury Clerk's election to follow a variant of this procedure does not contribute to "a substantial and unwarranted departure from the congressional schema." Defendant's Memorandum at 8. It is simply frivolous to inflate this modest exercise in ministerial discretion into a flagrant abuse of the Act's policies similar to that condemned in *Rabinowitz v. United States*, 366 F.2d 34 (5th Cir. 1966) (clerk of court, deputy and jury commissioner compiled jury list using own standards of character, intelligence and ability to comprehend judicial process; exercise disapproved since resulting list had extreme underrepresentation of Blacks).

### "Random" Selection Within the Meaning of the Act

■ The defendant complains that the selection of prospective jurors from voter registration lists by the use of starting and quotient numbers that take names at specific intervals is not "random" in its true

sense. Because voter registration lists are themselves "random" in that their composition cannot be predetermined or manipulated, the Court finds no substantial failure to comply with the Act in using a convenient computer program that counts off from a "starting number" that is itself chosen at random.

### Constitutionality of One-Year Residency Requirement in the Act

■ The defendant attacks, as violative of due process, the requirement of section 1865(b)(1) that a person have resided for one year within the judicial district in order to be eligible for jury service. Recognizing that he has no such standing as supported the challenges to personal deprivation in *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (durational residency requirements for voting); *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (residency requirements for receipt of welfare assistance); and *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974) (receipt of free medical care and hospitalization), he nevertheless asserts that his "close relationship" with those who are barred from jury service by the one-year residency requirement gives him standing to assert their rights. In support of his position he cites *Mancuso v. Taft*, 476 F.2d 187 (1st Cir. 1973), and *Walgren v. Board of Selectmen*, 519 F.2d 1364 (1st Cir. 1975), the latter relying on *Mancuso*. In *Mancuso* the court permitted a candidate to assert the rights of voters where his own candidacy was threatened by a local restriction. The court held:

> A candidate for public office . . . is so closely related to and dependent upon those who wish to vote for him and his litigation will so vitally affect their rights that courts will relax [rules of standing]

and will permit a candidate to raise the constitutional rights of voters.
*Id.*, 476 F.2d at 190.

While it is true beyond cavil that the defendant is "dependent" upon those who would be potential jurors at his trial, the Court cannot agree that "his litigation will . . . vitally affect their rights." The "right" to sit in judgment of a particular defendant is no right at all; even if it were, it would be absurd to equate it with the right to vote for a particular candidate whose election vel non might have a serious reciprocal effect on the voting citizen. Moreover, since a citizen may become eligible to serve on a jury after one year's residence in the district, it is only those persons who do not stay put for a year at a time who are forever excluded by this provision. The Court does not see sufficient nexus between the defendant and our more nomadic countrymen to designate him advocate of their rights.[8]

### Conclusion

The defendant requested that the Court hold its decision on this matter in abeyance pending a post-trial hearing on the allegations made. Having seen the defendant's offer of proof, the Court has determined that no hearing is mandated by section 1867(d): the defendant has not offered a "statement of facts which, if true, would constitute a substantial failure to comply with the provisions" of the Act. Moreover, this challenge was originally proffered with seven other pretrial motions on January 11, 1978. The prolixity, number and complexity of the motions required the Court to grant a continuance "to the extent necessary" under the Speedy Trial Act, 18 U.S.C. § 3161(h)(8), in order to permit fair consideration of the motions and adequate preparation for trial, and in order to further the ends of justice. *See* Memorandum and Order dated February 28, 1978, at 1, 6. With respect to the grand jury challenge, the

---

8. Nor is this a case where a substantial and identifiable class of citizens has been systematically excluded from jury service, enabling a defendant to challenge their exclusion on the ground that their absence is a source of poten-

tial harm to him. *See Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); *Peters v. Kiffs*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972).

Court stated in the same Memorandum and Order that it had directed "at the conference of February 23 . . . that any arrangements for the production of [the relevant computer records] be speedily concluded so that their analysis will not further delay the prosecution of this action." *Id.* at n.1.

It is now September. By his own admission, the defendant secured the materials he requested "on or about April 23 and April 27, 1978." Warman Affirmation ¶ 7. Four months later the defendant is not able to expose any cognizable flaw in the jury selection process. The Court has rejected every contention raised; there is little likelihood that six or eight weeks hence there will be a new theory that raises a colorable claim of noncompliance with the Act. Although the defendant has reminded the Court that "[i]n matters of such importance the court should not be inflexible in allowing continuances or other modifications of trial procedure in order to allow exploration of reasonable claims of improper jury selection procedures," *United States v. Fernandez, supra,* 480 F.2d at 731 n.7, the Court does not feel it excessively rigid to call a halt to this endless proceeding after so many months. Therefore, for all the reasons stated above, the defendant's motion to defer consideration of his challenge to the selection of jurors in the Southern District is denied, and the substantive challenge to the selection process is likewise denied.

So ordered.