OPINION OF THE COURT
Stuart Namm, J.
The defendant, a 19-year-old black male youth, is charged with the attempted murder of a Suffolk County uniformed police officer, whilé attempting to avoid arrest by him on a robbery charge. The officer is alleged to have been shot twice with his own weapon in a struggle, during which the defendant allegedly took the officer’s gun from its holster.
In a pretrial motion the defendant alleged that the present method of selecting jurors for petit jury service violates his constitutional rights; specifically, that there is a systematic exclusion of black youths between the ages of 18 and 21. In support of his application, the defendant alleged in an affidavit that a predominantly white school *1058 district, Smithtown, at the request of the Commissioner of Jurors, provides a list; on a regular basis, of its graduating senior class; whereas two other school districts with large black populations, Wyandanch and Amity ville, have never been so solicited by the Suffolk County Commissioner of Jurors. The People denied these allegations, claiming that all Suffolk County school districts had been solicited, and the factual issues were thus drawn.
THE HEARING
This court chose to conduct a hearing to determine whether there had, in fact, been a systematic exclusion of blacks between the ages of 18 to 21 from jury service in the County of Suffolk. To that end, the defendant, who has the burden of proof in such a hearing, offered the testimony of the principals of: (1) Brentwood High School, which has a black student population of approximately 10% to 11%; (2) Wyandanch High School, which has a black student population of approximately 94%; (3) Amity ville Memorial High School, which has a black student population of approximately 58%; and the attendance officer of Central Islip High School, which has a black student population of approximately 17% to 18%. Each of these witnesses testified that a search of school records from 1979 to date revealed that none of these schools had been solicited by the Commissioner of Jurors requesting a list of its high school graduates. In contrast, however, the former Commissioner of Jurors, Albert J.J. Cavagnaro, testified that in each of the years, 1979, 1981 and 1983, his “Chief Qualifying Clerk” had sent out letters of solicitation to every high school within the County of Suffolk. His testimony was corroborated by the testimony of Lydia Carrera, a senior office typist, who supervised the qualifying of prospective jurors, and who claimed to have sent out all such letters, although no copies thereof were retained on file. There was, however, a list kept which purportedly recorded all schools that were solicited, and their response, if any, to the request for the names of its graduating seniors.
According to her testimony, a substantial majority of the schools did not respond; a few refused to provide such a list, and of those schools which did respond, if no part-time *1059 clerical help were available to send questionnaires to these prospective young jurors, it would not be done. Furthermore, although none had been requested, if addresses of graduates were not provided by the school, that list of names would be ignored. Moreover, if a school failed to respond, no effort was made to determine if the solicitation letter was ever received by the school, or whether the school intended to respond thereto.
Three of the schools, whose representatives testified at this hearing, were among those which the Commissioner of Jurors claimed had never responded to the solicitation sent in 1979,1981 or 1983, and the fourth, Brentwood, through its principal, after first testifying that none had been received, and under circumstances which could be termed suspect, thereafter agreed that it had been solicited in 1983, and had responded by sending a copy of its commencement exercise program listing the names of its graduates. The Brentwood students were never sent qualifying questionnaires, however, since no addresses were provided by the school. The former Commissioner testified that in 1980 and 1982, over 500 persons between the ages of 18 and 21 were solicited in a random manner using lists of licensed operators provided by the Department of Motor Vehicles. However, the source material was not retained by the Commissioner’s office, and whether such solicitation was, in fact, accomplished could not be corroborated by the court, nor could these records be examined by the defendant’s counsel pursuant to a subpoena duces tecum which had called for the production of such material in court.
The defendant also offered the testimony of seven very active Suffolk criminal trial lawyers, one of whom was the former District Attorney of Suffolk County, Henry F. O’Brien, Esq., each of whom testified that between the years 1979 to date, he had never seen a black person between the ages of 18 to 21 as a member of a prospective petit jury panel called to service in the County of Suffolk. To counter this, the People presented the testimony of four Assistant District Attorneys, each of whom was either a Bureau Chief or a Deputy Bureau Chief. Each testified that during this same period of time, he had observed at least one black person between the ages of 18 through 21 on every two or *1060 three panels of 50 persons called to petit jury service. It is interesting to note that the latter testimony comports with the county-wide statistics, based upon the 1980 census, that approximately 1 out of every 149 persons between the ages of 18" to 76 (the outer age limits of jury service eligibility; Judiciary Law, § 510, subd 2) in Suffolk County is a black youth between the ages of 18 to 21.
The court also heard the testimony of a senior planner employed by the Long Island Regional Planning Board, Roy Fedelm, who also serves as the head of the State data center. His testimony, which was based upon information contained in the 1980 census, has been supplemented by judicial notice which this court has taken sua sponte of demographic data contained in the same census.
As of the 1980 census (the most recent statistical data available), there were 842,223 persons between the ages of 18 to 76 residing in the county, 89,297 of whom were between the ages of 18 to 21, or 10.6%. Within the entire 18 to 21 age group, there were 5,584 blacks or 6.25% of all persons 18 to 21 years old. Of the 5,584 blacks between the ages of 18 to 21, a total of 1,973, or 35.3%, resided in the communities of Brentwood, Central Islip, North Amity-ville and Wyandanch, whose youth attended the four high schools which claimed not to have been solicited in 1979, 1981 or 1983. Two communities, Smithtown and Stony Brook, whose high schools were solicited each of those years, and each of which provided the names and addresses of its graduates who were sent qualifying questionnaires, have .19% and 1.41% populace of black youths, respectively, between the ages of 18 to 21 in relation to their entire 18- to 21-year-old population. In contrast, Brent-wood, Central Islip, Wyandanch and North Ámityville (which is serviced by Amityville Memorial High School) have 7.24%, 21.49%, 64.49% and 83.55%, respectively..
The court also took judicial notice sua sponte of statistical data provided by the Office of Court Administration relating to the current Suffolk County master jury list from which panels of petit jurors are selected. There are presently 103,029 persons in the master jury pool, or approximately 12.2% of the entire population between the *1061 ages of 18 through 76; 2,137 of whom were born in 1963 (2% age 21); 154 born in 1964 (.15% age 20); 219 born in 1965 (.21% age 19); and 0 born in 1966 (0% age 18).
Of the four particular communities considered herein, there are only four persons between the ages 18 to 21 from Brentwood in the master jury pool, although there are a total of 3,040 persons represented from that community. Likewise, there are only four persons between the ages 18 to 21 from Central Islip, of a total of 1,561 persons represented from that community in the master jury pool. As to Wyandanch and North Amityville there are 8 and 0 youths 18 to 21 years old in the pool from a total of 630 and 11 individuals, respectively, represented in the jury pool from those communities. Furthermore, there exists no means by which this court can determine what percentage of those persons are black, since the Commissioner testified that no such statistics are maintained by his office; and the qualifying questionnaires utilized by the county are deemed confidential, and are not to be disclosed except to the county jury board or by permission of the Appellate Division. (Rules of App Div, 2d Dept, 22 NYCRR 693.4.)
The former Commissioner of Jurors and the “Chief Qualifying Clerk,” after substantial prodding by the District Attorney, testified that the county utilizes a random method to select persons from the source material available to them, i.e., voter registration lists, volunteers and lists of licensed operators provided by the Department of Motor Vehicles. They further testified that all high school graduates whose names were furnished by any school which had responded to their request were then sent qualifying questionnaires, if addresses were provided. The Commissioner, however, equated “random selection” as being synonymous with “arbitrary selection,” and it was conceded by him that the clerks who chose the individuals to be sent such a questionnaire had “a certain amount of discretion.” (See United States v Huber, 457 F Supp 1221, 1231-1232; People v Rosado, 89 Misc 2d 61, 62, revd on other grounds 64 AD2d 172.) Furthermore, except for a list of registered voters residing in the Town of Smithtown which was utilized by the office of the Commissioner in 1983, no other records have been kept, and all source *1062 materials utilized by these clerks have been discarded or destroyed. Accordingly, there is no means available independent of the testimony of the “Chief Qualifying Clerk” and the former Commissioner (who said he only checked periodically, and delegated his authority to the clerk) to physically corroborate that there had, in fact, been a random selection of persons from the source materials, rather than arbitrary selection, by clerks which could have resulted in neglecting entire communities, or portions thereof, especially those communities with the largest concentration of black citizens, namely, Wyandanch, North Amityville, Central Islip and Brentwood.[1] (See Judiciary Law, § 506, as to the authority vested in the Commissioner of Jurors for the random selection of prospective jurors.) Moreover, this court cannot ascribe full credit to the testimony of the former Commissioner, since he seemed far removed from the daily operations of his office. For example, it was his belief that during the years in question one of the source materials used to obtain the names of prospective jurors had been “Cole’s”, a telephone directory listed by street address of the residents of the County of Suffolk. In reality, the “Chief Qualifying Clerk” stated that “Cole’s” had never been used as a source material for the years 1979 through 1983.
SCOPE OF THE COURT’S DECISION
In arriving at its conclusions of law, this court could have chosen one of two routes to arrive at the ultimate disposition of the issues presented. The court could have rendered a decision within narrow legal parameters based upon the constraints of prior judicial precedent without consideration of the substantial amount of evidence presented and testimony adduced during the hearing. To do so, however, would be to ignore the facts discovered during the course of the hearing which shocked the conscience of the court.
*1063 The second choice, and the one which this court has chosen to take, is to arrive at the same conclusion, but only after a full and complete consideration of all of the evidence amassed throughout the hearing. This is done in the belief that the publication of such finding will result in a speedy and total revision of existing questionable practices engaged in by the office of the Commissioner of Jurors of Suffolk County, which practices this court lacks the requisite jurisdiction to alter by court order or otherwise. (Judiciary Law, § 190.)
SYSTEMATIC EXCLUSION OF BLACKS BETWEEN THE AGES OF 18 TO 21 YEARS
The People have contended from the outset that the defendant has the burden of proving an intentional and systematic discrimination in the selection of young black adults eligible for jury service, and that a showing of mathematical disparity, without more, is insufficient to satisfy this burden. (People v Chestnut, 26 NY2d 481, 488.) They have correctly argued that the defendant is not entitled to a jury of any particular composition, and that the issue before the court is whether the defendant has submitted proof sufficient to establish the existence of intentional and systematic discrimination in the jury selection process. (People v Parks, 41 NY2d 36, 43.)
In its most recent expression on this subject, the Court of Appeals has recognized that in a constitutional challenge, which, as in the instant case, claims a denial of the equal protection of the laws, unlike a due process challenge, a defendant may establish a prima facie case without explicitly proving that the discrimination was caused by systematic exclusion. A showing that the selection process is “susceptible of abuse” or is not racially neutral supports the presumption of discrimination raised by the statistical showing. (People v Guzman, 60 NY2d 403, 412.)
The defendant has successfully met this burden herein by revealing a system of juror selection in the County of Suffolk between the years 1979 through 1983, which was “susceptible of abuse,” and which created a distortion in the numbers of black youths between the ages 18 to 21 who are solicited and qualified for jury service relative to all persons qualified for jury service, or even persons only *1064 between the ages of 18 to 21. (See Castaneda v Partida, 430 US 482, 492, citing Hernandez v Texas, 347 US 475, 477; People v Guzman, supra.)
Although it is clear that the use of voter registration lists (as mandated by the Judiciary Law, § 506) does not per se result in a constitutional violation, absent a showing of the systematic exclusion of a class of qualified citizens (Hallman v United States, 490 F2d 1088, 1092), where the Commissioner of Jurors has recognized an obligation to systematically seek out 18- to 21-year-old adults for jury service, he is then under an obligation to insure that he does so in a nondiscriminatory, nonarbitrary, fair and equitable manner.[2]
“To rebut this inference of discriminatory intent, the State has the burden of showing that the underrepresentation has been caused by nondiscriminatory factors or by permissible racially neutral selection criteria and procedures (Castaneda v Partida, supra, at pp 493-494; see Duren v Missouri, 439 US 357, 368, n 26, supra). Simple protestations that racial considerations play no part in the selection process will not constitute an adequate rebuttal (Castaneda v Partida, supra, at .p 498, n 19). Nor may the State ‘rely on a presumption that the officials discharged their sworn duties to rebut the case of discrimination’”. {People v Guzman, supra, at p 412.)
Suffolk County, not unlike many other postwar suburban American communities, has mushroomed from a sparsely populated agricultural county into a populous sprawling network of smaller hamlets, incorporated villages and towns. Within the county, there exist communities of persons linked by similar socioeconomic and ethnic bonds which are predominantly black, e.g., Wyandanch, North Bellport and North Amityville. It is common knowledge that within those communities reside the greatest concentration of black citizens, with the balance of black citizens being scattered throughout the county. Accordingly, it would not be a difficult matter for persons with less than honorable intent to summon black persons, or *1065 blacks between the ages of 18 to 21, for jury service in a proportion far less than such persons exist within the general population of the county.
It is essential, therefore, that the letter of the law be scrupulously adhered to, namely, random selection, in the solicitation of prospective jurors, and that all communities be similarly canvassed; black, e.g., Amityville and Wyandanch; white, e.g., Smithtown and Stony Brook; and racially mixed, e.g., Brentwood and Central Islip, so that all eligible citizens are given the opportunity to serve as jurors.
It did not suffice, therefore, for the Commissioner of Jurors to solicit lists of graduating seniors from Suffolk County high schools, and then to summon only those persons whose names and addresses were provided from the small fraction of schools that responded and to ignore those that purportedly did not respond, refused to respond, or responded at a time when there was insufficient clerical help available to type and send qualifying questionnaires. Moreover, this court is not satisfied, from the proof adduced, that, in fact, all schools were so solicited, especially in the light of the testimony of the representatives from Wyandanch High School, Amityville Memorial High School, Central Islip High School and Brentwood High School, and the failure on the part of the Commissioner’s office to keep satisfactory records to rebut the inference of discrimination raised by the defendant. Clearly, such questionable practice was precisely what the Court of Appeals must have had reference to in the Guzman decision (supra) when it spoke of a system “susceptible of abuse.”
The result of the Commissioner’s action, or nonaction, as the case may have been, was the summoning of a concentration of 18- to 21-year-old youths from certain predominantly white communities within the county, while ignoring the youths residing in predominantly black and racially mixed communities, thereby resulting in a numerical distortion in the master jury pool, and a de facto exclusion of black youths between the ages 18 to 21.
Furthermore, this court is not confident, based upon the state of the record, that in the years 1980 and 1982, there was a solicitation of persons between the ages of 18 to 21 *1066 from a list of licensed operators provided by the Commissioner of Motor Vehicles. Assuming, arguendo, that the same had been done, based upon the known statistics, and absent the existence of such source materials, can one be certain that such selection was “random” rather than “arbitrary?” To pose the question is to provide the answer.
This court is not prepared to conclude as some courts in the past have, that young people are not registered (United States v Guzman, 468 F2d 1245, cert den 410 US 937), or that they do not respond to a jury summons (People v Rosado, supra), or that blacks have failed to respond in disproportionate numbers (People v Chesler, 91 Misc 2d 551, revd on other grounds 71 AD2d 792). This court is far from persuaded that the disproportionate number of blacks in the jury pool results from anything but their systematic exclusion, stemming from an arbitrary selection of names of persons from schools that responded to the Commissioner’s solicitation. Assuming, arguendo, that schools were solicited, it was a high school principal who was given the choice for all in the graduating class whether they would be provided the opportunity to participate in the fundamental bulwark of our system of justice, the jury process, rather than the individual himself or herself. No less than the district superintendent or Board of Education, itself, should have been called upon to make such a policy decision. Worse yet, if, as appears, only a small percentage of schools were actually solicited — and those being in predominantly white communities — there was, in fact, a systematic exclusion of black youths. In either event, there has been a de facto exclusion of black youths between the ages of 18 to 21 from participation in jury service in the County of Suffolk during the years 1979 through 1983, by reason of either malfeasance (fostering a system which was susceptible of abuse) or invidious discriminatory practices in the office of the Commissioner of Jurors.
BLACK YOUTHS BETWEEN 18 TO 21 AS A RECOGNIZABLE GROUP
Having concluded that there has been a de facto exclusion of black youths between the ages of 18 and 21 in Suffolk County during the years 1979 through 1983, the question still remains whether such discrimination has risen to constitutional dimensions.
*1067 “The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered. A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government * * * Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge.” (Duncan v Louisiana 391 US 145, 155-156; emphasis added.)
The defendant, herein, contends that by systematically excluding blacks between the ages of 18 to 21, he has been unconstitutionally deprived of his fundamental right to be tried by a jury of his peers. Having made such allegation in the abstract, he has offered no evidence during the course of this lengthy hearing to persuade this court to conclude that there is a recognizable distinction between young blacks 18 to 21 years of age and others within the Suffolk County community. While this court might, sua sponte, conclude, simply by virtue of racial and cultural considerations that there is a distinct recognizable difference between black youths between the ages of 18 to 21 and other members of the community who are well represented in the jury pool, the constraints of prior legal precedent preclude the court from making such a quantum leap.
In order to establish a prima facie violation by the State in its failure to guarantee that juries represent a fair cross section of the community, the defendant must show (1) that the group alleged to be excluded is a “distinctive” group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process. (Duren v Missouri, supra, at p 364.)
The question whether young people, variously defined, are a “distinctive” group, per se, under Duren (supra) has been much bruited about in the Federal courts. There, the weight of authority is in the negative (see Brown v Harris, 666 F2d 782, 783, citing United States v Ross, 468 F2d 1213, 1217; United States v Kuhn, 441 F2d 179, 181; *1068 United States v DiTommaso, 405 F2d 385, 391; United States v Butera, 420 F2d 564, 570). The issue has likewise been booted about in our State courts, and the defendant’s contention that he has been deprived of a jury of peers would seem to be swimming upstream against a tide of judicial precedent holding to the contrary.
While the Court of Appeals has not specifically addressed this subject, there has been an abundance of lower court dicta which provides some guidance. The strongest language appears in People v Attica Bros. (79 Misc 2d 492), where the court, citing the various Federal cases, rejected youth as a factor injury selection matters. There the court pointed out that age has little reliability or probative value because statistics and ratios could be expected to change substantially depending on age brackets used. Alluding to article 2 of the Civil Rights Law, the court concluded that “young adults do not fall within any of the categories against whom discrimination is prohibited” (supra, at p 495).
In People v Rosado (89 Misc 2d 61, 64, supra), the court concluded that the absence of a proportionate number of 18 to 21 year olds “does not, per se, render the panel an unrepresentative cross section of the community” (emphasis added). Although that court found a disparity of those in the 18- to 21-age group called for jury service, it found no basis for a finding of invidious discrimination against that group.
It is interesting to note that in the one case arising out of Suffolk County, People v Minarich (89 Misc 2d 670) in 1977, the court found that a deliberate effort was made to reach 18-year-old citizens through solicitation of the high schools they attended. However, it appears that the focus in that case was upon the defendant’s claim “that the selection process does not reach the unenrolled resident who does not have a phone listed in his name” (supra, at p 670). There, no claim had been made, nor was there any “evidence that a distinctive group has [sic] been * * * excluded from the jury selection process” (supra, at p 671).
In People v Chesler (supra), the court concluded that the 18- to 21-age group does not “constitute a recognizable, distinct class whose exclusion or underrepresentation from *1069 jury service violates defendant’s constitutional rights” (supra, at p 556). Pointing out that “ ‘[Challenges based upon discrimination against a particular age group have met with virtually unanimous failure’ ” (supra, at p 557), the court found, inter alia, that the defendant failed to make a prima facie case. It should be noted that such case arose in the Supreme Court, Monroe County, where jurisdiction of the court therein exceeded the jurisdiction of this court. Thus, where the court found underrepresentation of blacks in the jury pool, but not substantial enough to violate constitutional standards, the court directed the Commissioner of Jurors to take certain positive steps to increase black representation on juries. This court, however, lacks the jurisdiction to order any such remedial action.
Perhaps the most recent in-depth discussion of the subject is found in People v Thompson (79 AD2d 87, 101, app withdrawn 55 NY2d 879). Citing the Supreme Court of the United States in Duncan v Louisiana (supra), the Appellate Division, Second Department, opined that “ ‘if large, distinctive groups are excluded from the pool’ ” the “ ‘fair cross-section’ ” requirement fundamental to the jury trial will not be met. While that case concerned the abusive use of peremptory challenges by the prosecutor, the principle which it espoused, inter alia, is no less applicable to the case at bar. Quoting Mr. Justice Thurgood Marshall in Peters v Kiff (407 US 493, 503): “When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable” (emphasis added).[3]
Therein lies the burden which the defendant has been unable to overcome. He has failed in his burden to convince this court that, although black youths between the ages of 18 to 21 have been systematically excluded from jury service in the County of Suffolk, they represent a large and identifiable segment of the community of this county. Their number (.67%) of the total eligible population alone — without more — belies such proposition. The footnote in *1070 United States v Guzman, notwithstanding, i.e., that “despite talk of‘generation gaps,’ there are great disparities in opinions, attitudes, experiences and life-styles among young people” (468 F2d 1245, 1247, n 5, supra); black youth between the ages of 18 to 21 may very well be a distinctly recognizable group. If the magnitude of their numbers were such in this county to conclude that they represented a large and identifiable segment of the community, this court might reach an opposite conclusion. Nevertheless, such is not presently the case, and, accordingly, this court is constrained to conclude that the defendant has failed to make out a prima facie case.
For all of the foregoing reasons, the defendant’s application is denied.

. This is far more serious than “the failure to retain the minutiae detailing the ‘process’ by which jurors are selected, e.g., the interim programming materials for the computers, the mathematical calculations made by the Jury Clerk in devising the quotient and starting numbers” (United States v Huber, supra, p 1231), where computers were being used for the random selection of prospective jurors in the Southern District of New York. In Suffolk County, no computers were utilized for the selection of jurors. It was being accomplished by clerical personnel ostensibly delegated “a certain amount of discretion,” in the words of the former Commissioner of Jurors.

. “It is the policy of this state that all litigants in the courts of this state entitled to a trial by jury shall have the right to grand and petit juries selected at random from a cross-section of the community in the county * * * and that all eligible citizens shall have the opportunity to serve”. (Judiciary Law, § 500.)

. Compare, however, People v McCray (57 NY2d 542), on the subject of peremptory-challenges.