**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Pedro Pablo RODRIGUEZ,
Defendant-Appellant.**

**No. 77–5691.**

United States Court of Appeals,
Fifth Circuit.

Feb. 1, 1979.

Rehearing Denied March 7, 1979.

Richard M. Gale, Miami, Fla., for defend-
ant-appellant.

Jack V. Eskenazi, U. S. Atty., Hugh F. Culverhouse, Jr., Linda Collins Hertz, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, TUTTLE and THORNBERRY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

The Southern District of Florida again faces a challenge [1] of its jury selection procedures in this appeal from a conviction for importation of [2] and possession with intent to distribute cocaine.[3] Appellant Pedro Pablo Rodriguez levels a combination constitutional and statutory attack on the make-up of his grand and petit juries, asserting that (1) Latin American registered voters were systematically excluded from the master wheel [4] and (2) the statutory procedures for emptying and refilling the master wheel had not been complied with. He also complains that the District Judge improperly denied his requested instruction regarding specific intent under the importation count. We affirm.

On March 14, 1977, appellant arrived at the Miami International Airport after a short trip to Cali, Colombia. When he went through customs, an agent discovered cocaine secreted in his suitcase. Although he protested that he knew nothing about the cocaine [5] and insisted that the bag could not be his, customs agents found that the baggage tags appellant carried matched those on the suitcase. He was then placed under arrest.

Prior to trial, counsel filed several motions to dismiss the indictment.[6] After two evidentiary hearings, the Magistrate filed a report, which included findings of fact, conclusions of law, and a recommendation that the District Court deny each motion. Appellant made specific objections to the re-

---

1. *See United States v. Blair,* 5 Cir., 1972, 470 F.2d 331, *cert. denied,* 1973, 411 U.S. 908, 93 S.Ct. 1536, 36 L.Ed.2d 197; *United States v. Pentado,* 5 Cir., 1972, 463 F.2d 355, *cert. denied,* 409 U.S. 1079, 93 S.Ct. 698, 34 L.Ed.2d 668.

2. Importation of a controlled substance violates 21 U.S.C.A. §§ 952(a) and 960(a)(1).

3. Possession with intent to distribute a controlled substance violates 21 U.S.C.A. § 841(a)(1).

4. The selection of names for the master wheel begins the process that ultimately produces grand and petit jury panels in federal trials. *See* 28 U.S.C.A. §§ 1863(b)(2) and (4).

5. In response to questioning by one DEA agent, appellant stated that he was "checking out" Cali for a vacation. At trial he explained that he had gone to Cali to pick up some papers for a man who had offered him $3,000 ($1,500 up front and $1,500 on return) to make the trip. According to his testimony, when he left for Cali, he thought that the trip involved legitimate business. When, on the next day, a man gave him a suitcase full of clothing, he became scared but decided to go through with the deal in order to collect the balance of the money.

6. On April 20, 1977, counsel filed his first verified motion to dismiss the indictment and stay the proceedings. He alleged that the method of choosing the grand jury resulted in a non-random selection and a consequent systematic exclusion of students, blacks, and persons with Spanish surnames. Finding that appellant must offer statistical data to support such a motion, the Magistrate ordered that he be allowed access to all relevant jury documents and provided that he could file a detailed statistical statement by a certain date.

Counsel subsequently filed an almost identical motion challenging the composition of petit juries. His statistical report followed soon thereafter. The Magistrate ordered government response and set the matter for a hearing.

Before the hearing, appellant's counsel filed three more motions, each to dismiss the indictment. One alleged that the Southern District of Florida should, under 28 U.S.C.A. § 1863(b)(2), use sources in addition to voter registration lists to obtain a fair cross section of the community for jury panels. Appellant later abandoned this claim and did not raise it on appeal.

The second motion alleged that the Southern District's plan as applied results in the systematic and arbitrary exclusion of Latin Americans in the Miami division. The third and last of these motions to dismiss the indictment claimed that the District had violated 28 U.S.C.A. § 1863(b)(4) by allowing more than four years to elapse before refilling the master wheel. Appellant at no time moved for a stay of proceedings based on alleged violations in the selection of petit juries.

port, and the District Judge accordingly reconsidered the challenged portions. Finding the Magistrate's findings and recommendation correct, he denied appellant's motions.

█ Having been unsuccessful in dismissing his indictment, appellant stood trial before a jury[7] and was convicted on both counts. On appeal, Rodriguez first complains that the Southern District's jury selection plan[8] has denied him equal protection and due process by systematically and arbitrarily excluding many registered voters who were born in Spanish-speaking countries. Because a tremendous number of these persons registered to vote after the compilation of the 1972 voter registration lists,[9] he argues, maintenance of a fair cross section of the community required supplementation of the wheel.[10] Thus, his having been tried by a jury chosen from this out-of-date wheel warrants reversing his conviction.

7. The trial took place on August 29 and 30, 1977.

8. Appellant's grand and petit juries were selected pursuant to the District's 1973 plan, which was approved effective April 17, 1973, by the Reviewing Panel, comprised of the Judicial Council of the Fifth Circuit and the Chief District Judge. The plan was designed to follow the guidelines and implement the policy of the Jury Selection and Service Act of 1968 as amended, 28 U.S.C.A. § 1861 et seq. It provides that voter registration lists, which it deems to represent a fair cross-section of each affected community, shall supply the source of names for the master wheel. The plan further provides that the master wheel "shall be emptied and refilled every four years . . . between March 1 and September 1, with names obtained from the voter registration lists of each county within said jury division as of the last preceding General Election."

On July 12, 1977, the Reviewing Panel approved the Southern District's 1977 plan, which contains provisions for the use of electronic data processing methods in jury administration. This plan required that the Clerk "obtain, following the General Election held in 1976 and every four years thereafter, a list of registered voters for each county in each jury division." From that list, he must randomly select names for the master jury wheel. According to the procedure, each master wheel must be emptied and refilled "every four years between the date of the November General Election and September 1st of the following year . . . ."

The Supreme Court has often instructed that "it is a denial of the equal protection of the laws to try a defendant of a particular race or color under an indictment issued by a grand jury, or before a petit jury, from which all persons of his race or color have, solely because of that race or color, been excluded by the State, . . . ." *Hernandez v. Texas,* 1954, 347 U.S. 475, 477, 74 S.Ct. 667, 670, 98 L.Ed. 866, 869; *Castaneda v. Partida,* 1977, 430 U.S. 482, 492, 97 S.Ct. 1272, 1279, 51 L.Ed.2d 498, 509. While recognizing that an official act does not violate constitutional principles *solely* because it has a racially disproportionate impact, *Washington v. Davis,* 1976, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597, 607, the Court has warned that a facially neutral state action may produce "a clear pattern" of discrimination, "unexplainable on grounds other than race." *Arlington Heights v. Metropolitan Housing Corp.,*

The Clerk testified at the hearing before the magistrate that the process of converting to electronic data processing had begun in January 1977, and that the first qualified wheel should be ready near the first of September 1977. The record shows that the master wheel was actually emptied and refilled on August 18, 1977, with the new qualified wheel following about three weeks later.

9. These lists comprised the 1973 plan's master wheel.

10. Rodriguez cites 28 U.S.C.A. § 1863(b)(4), pointing out that the statute provides for supplementing the names in the master wheel. If appellant were making a purely statutory claim (enforceable only under 28 U.S.C. § 1867) that the statute *requires* the addition of names, we would dismiss it without difficulty. The language of the statute—"may order additional names . . . as necessary"—clearly contemplates allowing the District Judge discretion to determine when and if such addition is necessary. It does not mandate that each District's plan establish regular intervals for supplementation.

To the extent, however, that appellant argues that the 1973 wheel was constitutionally infirm and that the statute offered a reasonable method of overcoming the deficiency, his claim would generally warrant further consideration. Since, however, we ultimately find that the plan did not operate systematically to exclude registered voters born in Latin America, we accordingly reject the § 1863(b)(4) claim.

1977, 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450.

■ The Supreme Court has established a two part test for examining alleged discrimination in jury selection. *Hernandez, supra* 347 U.S. at 479, 74 S.Ct. 667. Under it, appellant must first prove that the group of newly registered voters [11] who were born in Spanish-speaking countries constitute a distinct, separate class.[12] *Id.* Next, he must show discriminatory underrepresentation "by comparing the proportion of the group in the total population to the proportion called to serve . . . over a significant period of time." *Castaneda, supra* 430 U.S. at 494, 97 S.Ct. at 1280. *See also, Norris v. Alabama,* 1935, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074; *United States v. De Alba-Conrado,* 5 Cir., 1973, 481 F.2d 1266.[13]

■ In applying the test to the facts before us, we find that because appellant has made uncertain showings under both steps we cannot uphold his claim. First, he has presented no evidence upon which we can find that the group he has identified constitutes a cognizable class for the purpose of this sort of jury challenge. He merely asserts that his statistics [14]—which, if reliable, indicate that the number of registered voters of "Latin origin" has increased over 200% since the master wheel was last filled—indicate purposeful discrimination and, therefore, lead to the conclusion that the group is "treated as second-class citizens." This naked claim, however, does nothing to guide us to a finding that appellant has identified a single cognizable group rather than several—*e. g.* Cuban-Americans, Puerto Ricans, Argentine-Americans, Spanish-Americans, etc.[15] As the magistrate stated in her report, "there [is] simply no evidence upon which this Court could base a finding that persons of such diverse national origins as Cubans, Mexicans, and Puerto Ricans possess such similar interests that they constitute a cognizable group . . . ." [16]

11. The specific class includes all of those persons born in Spanish-speaking countries who had registered to vote since the 1972 elections.

12. In *Hernandez, supra* 347 U.S. at 479, 74 S.Ct. at 671, the Court stated that one method of demonstrating that a particular group of persons constitutes a cognizable class is "by showing the attitude of the community." *Castaneda, supra* 430 U.S. at 494, 97 S.Ct. at 1280, defined this first step as requiring a showing that the group is a recognizable class "singled out for different treatment under the laws, as written or as applied."

13. In *De Alba-Conrado* the Court found that defendant's having shown a "lack of individuals with 'Latin names'" on his jury merited holding a hearing to determine whether the jury selection plan *as applied* denied due process of law. It further instructed that

[o]n remand, the burden will be on appellant to prove that the jury selection process utilized in his case systematically and arbitrarily excluded a cognizable class or ethnic group from jury service to his prejudice. His proof must demonstrate that such procedure defeated a "fair possibility for obtaining a representative cross-section of the community."
481 F.2d at 1270.

14. See note 18, *infra.*

15. We are not examining a situation like that in *Hernandez, supra,* in which the defendant defined his class only as Mexican-Americans, and presented testimony showing that some separate facilities existed for Mexicans, and that few persons of Mexican descent participated in business and community groups. Similarly, appellant has not shown, as did the defendant in *Castaneda, supra,* that the group is under-privileged or economically disadvantaged. More importantly, the statutory scheme provided in the Jury Selection and Service Act—unlike the Texas "key-man" system reviewed in *Hernandez* and *Castaneda*—does not provide the opportunity for subjective selection of jurors. By mandating a random selection of jurors at specified intervals, the statute works effectively to prevent the abuse in application that the Court acknowledged was possible in the Texas system. *Castaneda* at 497, 97 S.Ct. 1272. *Cf. Porter v. Freeman,* 5 Cir., 1978, 577 F.2d 329 ("A variance of 20.4% between the percentages of female residents in the county and of women on the jury rolls is clearly sufficient to shift to the jury commission the burden of satisfactorily explaining the cause, *particularly in a system that is not based on random selection of jurors.*" (Emphasis added.))

16. He also claims that a comment made by the United States Attorney at one of the evidentiary hearings illustrates the discrimination these people suffer. The attorneys stated that ". . . while people at the end of the jury selection plan may be excluded due to an abundance of *new visitors from South America,* I

Since, therefore, we find that appellant has not proved the existence of a separate class,[17] his statistics hold less meaning.[18] The fact that his identified group grew drastically during the four-year period bears no more relevance to a showing of discrimination than do figures showing the proportion of growth of the entire voter population. No names were added to the wheel between 1973 and 1977. Consequently, newly-registered persons of Mexican, Canadian, Texas, English, and Polish descent were all temporarily excluded from the master wheel.[19]

Finally, we point out that appellant does not attack the composition of the master jury wheel as of the time it was filled in 1973. He instead asserts that during the statutory period Miami's population changed so radically that it rendered the composition of the wheel constitutionally infirm. In making his complaint—that the wheel should have been supplemented in response to such change—he does not take into account the Supreme Court's opinion in *Hamling v. United States*, 1974, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590. Faced in that case with a claim similar to that appellant raises today,[20] the Court observed that

> The master wheel . . . is periodically emptied and then refilled with names from the available voter lists. Persons added to the voter lists subsequent to one filling of the jury wheel are therefore not added to the wheel until the next refilling. But some play in the joints of the jury-selection process is necessary in order to accommodate the practical problems of judicial administration. Congress could reasonably adopt procedures which, while designed to assure that "an impartial jury [is] drawn from a cross-section of the community," *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181 (1946); *Smith v. Texas*, 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84 (1940), at the same time take into account practical problems in judicial administration. Unless we were to require the daily refilling of the jury wheel, Congress may necessarily conclude that some periodic delay in up-

think this is a natural course of events and the plan is complying with the Act." The Court immediately added, ". . . we are not talking about new visitors from South America, we are talking about United States citizens." We cannot agree that this isolated statement indicates anything about the status of Miami citizens who were born in Spanish-speaking countries. Indeed, we address this point only because appellant has offered no other evidence to support his claim.

**17.** *United States v. De Alba-Conrado*, footnoted *supra*, does not compel a different result. Although the Court remanded for a hearing upon defendant's showing a lack of persons with "Latin names" on his jury, it explained that

> [t]he necessity for a remand arises from the total lack of development in the court below of the pertinent facts necessary to a resolution of the crucial issue asserted here.

481 F.2d at 1270. The Court also strictly required that on remand defendant prove a cognizable class or ethnic group. *See* note 13, *supra*.

**18.** We further point out, as did Magistrate Sorrentino in her report, that appellant's statistical report contains serious deficiencies, *e. g.*, "[an] absence of reliable figures upon which the Court could base a finding of the actual percentage increase of Spanish-origin voters from the time of the 1972 general election." Although more reliable statistics are available for 1974, appellant has presented two conflicting 1976 figures from three different sources. Both, however, indicate that the "Latin" voting population greatly increased between 1974 and 1976.

**19.** *See United States v. Gooding*, 5 Cir., 1973, 473 F.2d 425, 430, *cert. denied*, 412 U.S. 928, 93 S.Ct. 2752, 37 L.Ed.2d 155, in which the Court found that "those Cuban immigrants who have become eligible for jury service by becoming citizens within the last three years and four months are not believed to be such distinct groups that their temporary exclusion from jury service violates their statutory right to serve on juries or defendant's right to a fair trial."

**20.** *Hamling* argued that because the wheel from which his jury had been selected was almost four years old, a cognizable group—persons between the ages of 18 and 24—had been effectively excluded from his jury. (The wheel, when refilled, would contain names of registered voters 21 and older). Assuming, without deciding, that the young were a cognizable group, the Court nevertheless found insufficient evidence to establish a prima facie case of discrimination. 418 U.S. at 137, 94 S.Ct. at 2917.

dating the wheel is reasonable to permit the orderly administration of justice. Invariably of course, as time goes on, the jury wheel will be more and more out of date, especially near the end of the statutorily prescribed time period for updating the wheel. But if the jury wheel is not discriminatory when completely updated at the time of each refilling, a prohibited *"purposeful discrimination" does not arise near the end of the period simply because the young and other persons have belatedly become eligible for jury service by becoming registered voters.* Whitus v. Georgia, 385 U.S. 545, 551, 87 S.Ct. 643, 647, 17 L.Ed.2d 599 (1967). (Emphasis added).

■ Appellant next claims that the selection of his petit jury violated 28 U.S.C.A. § 1863(b)(4), which requires "periodic emptying and refilling of the master jury wheel at specified times, the interval for which shall not exceed four years." [21] He has shown that the master wheel was filled on April 12, 1973, and that his trial began almost four years and four months later on August 29, 1977.[22]

■ We must first point out that appellant is relying on a purely statutory right—

he alleges no constitutional violation in connection with this particular claim. His remedy, therefore, is statutorily defined, and he must comply with statutory requirements in order to obtain relief. Congress has specified those requirements in 28 U.S.C.A. § 1867(a) and (d),[23] and we have consistently enforced them very strictly. *See United States v. Smith,* 588 F.2d 111; *United States v. Kennedy,* 5 Cir., 1977, 548 F.2d 608, 613, *cert. denied,* 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140; *United States v. De Alba-Conrado,* footnoted *supra* at 1269.

An examination of § 1867 reveals that a criminal defendant who challenges the procedures used in selecting a *petit* jury must (1) within prescribed time limits move to stay the proceedings and (2) present a sworn statement of facts, which, if true, would prove a violation of the Act. Although the language of subsection (a), in allowing a defendant to "move to dismiss the indictment or stay the proceedings against him" might seem to offer an option, subsection (d) makes it clear that that option is available only to those challenging their grand juries. A court faced with a

[21]. Appellant argues that to the extent that the Southern District's plan allowed juries to be selected from a wheel over four years old, *see* note 8, *supra,* the plan itself violated the Jury Selection and Service Act. Although our disposition of this case does not require that we decide whether the plan complied with the Act, we point out that a complaint under the Act need show only that the *particular procedures* used (whether or not sanctioned by the local plan) "substantially fail[ed] to comply with the provisions of [the Act] in selecting the grand or petit jury." 28 U.S.C.A. § 1867(a).

[22]. Appellant attacks only his petit jury. Since his indictment was filed on March 31, 1977, it is clear that the grand jury was selected and acted within the statutory time limits.

[23]. § 1867. Challenging compliance with selection procedures
(a) In criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply

with the provisions of this title in selecting the grand or petit jury.

\* \* \* \* \* \*

(d) Upon motion filed under subsection (a), (b), or (c) of this section, containing a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title, the moving party shall be entitled to present in support of such motion the testimony of the jury commission or clerk, if available, any relevant records and papers not public or otherwise available used by the jury commissioner or clerk, and any other relevant evidence. If the court determines that there has been a substantial failure to comply with the provisions of this title in selecting the grand jury, the court shall stay the proceedings pending the selection of a grand jury in conformity with this title or dismiss the indictment, whichever is appropriate. If the court determines that there has been a substantial failure to comply with the provisions of this title in selecting the petit jury, the court shall stay the proceedings pending the selection of a petit jury in conformity with this title.

proper attack on the selection of the petit jury has the power only to stay proceedings. Thus, appellant's motion, which requested only a dismissal of the indictment, was insufficient to invoke the only statutorily available relief.[24] We therefore reject his claim.[25]

We finally turn to Rodriguez's third claim, that the District Judge improperly instructed the jury on specific intent. He asserts that 21 U.S.C.A. §§ 952(a) and 960(a)(1),[26] under which he was charged, require the Government to prove the defendant's knowledge of the *specific* substance imported. While we agree that the statutes require a showing that appellant knew he was importing "a controlled substance," we do not think that they require the Government to prove that appellant knew that he was importing cocaine rather than some other controlled substance.[27] His claim must therefore fall.[28]

---

**24.** Indeed, a stay of the proceedings offers reasonable relief, aimed at the particular violation alleged. If a defendant has no legal complaint regarding the selection of his grand jury—as is the case here—he cannot complain that the indictment was delivered in violation of the Act. On the other hand, a stay of the proceedings pending proper selection of a petit jury assures that the defendant will be tried according to the statutorily prescribed procedures.

**25.** We point out that a denial of statutory remedy "visits no great injustice" on appellant. As this Court stated in *United States v. Kennedy, supra,* at 613:

Barring assertion of the statutory claim here visits no great injustice on this appellant. In the Act, Congress set out a uniform, relatively strict scheme for jury selection. Congress included a new remedy for substantial violations of the Act, regardless of whether the litigant challenging the jury had been prejudiced by the jury selection. As a price for this remedy, Congress was entitled to exact strict compliance with formal procedural rules.

**26.** § 952. Importation of controlled substances—Controlled substances in schedules I or II and narcotic drugs in schedules III, IV, or V; exceptions

(a) It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance in schedule I or II of

subchapter I of this chapter, or any narcotic drug in schedule III, IV, or V of subchapter I of this chapter,

\* \* \* \* \* \*

§ 960. Prohibited acts A—Unlawful acts

(a) Any person who—

(1) contrary to section 952, 953, or 957 of this title, knowingly or intentionally imports or exports a controlled substance,

\* \* \* \* \* \*

shall be punished as provided in subsection (b) of this section.

**27.** We emphasize that our holding by no means lightens the Government's burden to prove that a defendant charged under these statutes imported the particular substance alleged in the indictment.

**28.** *United States v. Zapata,* 5 Cir., 1974, 497 F.2d 95, cited by appellant, does not support his claim. In that case the District Judge had instructed the jury that the government must prove "[that] the person importing [the cocaine] had the guilty mind, was aware of the fact that he was committing some sort of wrong, or some sort of crime—not necessarily the crime of bringing in cocaine itself." *Id.* at 97–98. On appeal, this Court reversed, finding that such instructions might lead a jury to convict without finding that defendant had specific intent to import a controlled substance. In the case before us today, the jury charge clearly instructed that absent such a finding, the jury should acquit.