**UNITED STATES of America,**

v.

**YONKERS CONTRACTING COMPANY, INC.; Maybrook Industries, Inc.; Sullivan Highway Products, Inc.; Dutchess Quarry & Supply Co., Inc.; Edward J. Petrillo, Jr.; Nicholas F. Badami; Patrick W. Reardon; and Edmund V. Caplicki, Defendants.**

No. 87 Cr. 0559 (GLG).

United States District Court, S.D. New York.

March 28, 1988.

Ralph T. Giordano, Dept. of Justice, Antitrust Div., New York City (Rebecca Meiklejohn, Geoffrey Swaebe, Jr., Robert Einstein, of counsel), for U.S.

Berman Paley Goldstein & Berman, New York City (David R. Paley, of counsel), for Yonkers Contracting Co., Inc.

Burke & McGlinn, Suffern, N.Y. (Patrick T. Burke, of counsel), for Maybrook Industries, Inc. and Nicholas F. Badami.

Patterson Belknap Webb & Tyler, New York City (Frederick T. Davis, of counsel), for Sullivan Highway Products, Inc. and Patrick W. Reardon.

Shea & Gould, New York City (Ronald H. Alenstein, of counsel), for Dutchess Quarry & Supply Co., Inc.

Baden Kramer Huffman & Brodsky, P.C., New York City (William M. Brodsky, of counsel), for Edward J. Petrillo, Jr.

Stillman, Friedman & Shaw, New York City (Charles Stillman, of counsel), for Edmund V. Caplicki.

## OPINION

GOETTEL, District Judge:

The defendants in this case have been charged with criminal violations of the antitrust laws with respect to asphalt-paving contracts in Orange County. They have moved to dismiss the indictment on grounds that there were an insufficient number of blacks and Hispanics (referred to occasionally hereinafter as "minorities") on the grand jury which voted the indictment. They contend that this underrepresentation violates the Jury Selection and Service Act, 28 U.S.C. §§ 1861–77 (1982) (the "Jury Act"), and the Fifth and Sixth Amendments to the United States Constitution. They also move for an order enjoining their trial by a petit jury similarly selected.

This motion originally was filed last summer. The defendants, however, requested extensive discovery concerning the jury rolls, and that request was granted as a matter of right. *Test v. United States*, 420 U.S. 28, 29–30, 95 S.Ct. 749, 750–51, 42 L.Ed.2d 786 (1975). Following the submission of further briefs and affidavits by the defendants, the Government submitted its opposition papers in the fall. Numerous subsequent, similar submissions were made by the Government and the defendants. The defendants argued that an evidentiary hearing should be held or that, at a minimum, the decision of this motion should await Judge Motley's decision in *United States v. Biaggi*, 680 F.Supp. 641 (S.D.N.Y.), in which an evidentiary hearing had been ordered and at which certain of the defendants' experts in this case would be testifying. Judge Motley issued a forty-three page opinion on February 29, 1988 denying the defendants' motion. It appears, therefore, that this matter is ripe for a decision.

These cases,[1] and *United States v. Biaggi*, are not the first to raise these issues in

---

1. There is a similar criminal prosecution with the same title bearing number 87 Cr. 0560 as-

this district. Indeed, it has become a rather common ploy in criminal prosecutions.[2] We hasten to remind the defense bar, however, before it becomes too enamored with this "cutting-edge" defense technique, that challenges to jury-selection procedures in this district have yet to be successful.[3] This motion, likewise, is meritless; but, because so many grounds are alleged, some extended discussion is necessary.[4]

## FACTS

There are certain facts that are not in dispute or have been clearly established.

Despite being the largest district in the United States in terms of case volume and number of judges, the Southern District of New York, until October, 1983, had only a single place of sitting—the historic United States Courthouse in Foley Square. The district includes New York County (essentially the borough of Manhattan), Bronx County, and the six counties immediately north of New York City—Westchester, Rockland, Putnam, Orange, Dutchess, and Sullivan.[5] In October, 1983, a small branch of the court was opened in White Plains, New York, which is the county seat of Westchester County. A number of considerations supported the decision to open a branch of the court closer to the geographic center of the district. One such reason was to accommodate jurors and litigants from the more northerly counties who otherwise had to travel many hours to reach Foley Square, which is in the southernmost part of the district.

The opening of the White Plains courthouse required new jury lists for that court and some change in the method of drawing jurors for Foley Square (to be discussed *infra* in more detail). The grand jury that returned this indictment was impanelled and sat in the Foley Square courthouse during the transition period. At the conclusion of the transitional period and as presently constituted, there are two separate jury wheels—one for Foley Square and one for White Plains. Foley Square gets all prospective jurors who are residents of New York and Bronx counties. White Plains draws all prospective jurors who are residents of Sullivan, Orange, and Dutchess counties. Prospective jurors from Westchester, Putnam, and Rockland counties are assigned to both courthouses, with 90% being sent to Foley Square and 10% to White Plains. During the transitional period of about two years, from late 1983 to late 1985, however, Foley Square received prospective jurors from all eight counties in the district, while White Plains received a portion of those residents in the six counties north of New York City.

The Southern District's jury plan, which covers both courthouses and both jury rolls, uses voter registration lists to obtain prospective jurors. The voter registration

---

signed to Judge Conner. Except for the first-named defendant, Yonkers Contracting Company, Inc., and its president, Edward J. Petrillo, Jr., the defendants in the two cases are different. Judge Conner's case involves asphalt-paving contracts in Westchester County.

2. In addition to the two *Yonkers Contracting* cases and Judge Motley's decision in *Biaggi*, a similar challenge was recently rejected on procedural grounds by Judge Leval in *United States v. Tutino*, 87 Cr. 0270 (S.D.N.Y. Dec. 24, 1987). A fifth such challenge was made recently in a case before Judge Sprizzo, but it appears that challenge has been abandoned due to a plea bargain.

3. In addition to the above, similar challenges to the district's earlier jury-selection plans were rejected in *United States v. Gruberg*, 493 F.Supp. 234 (S.D.N.Y.1979) (Conner, J.) and *United States v. Huber*, 457 F.Supp. 1221 (S.D.N.Y.1978) (Tenney, J.).

4. One of the grounds originally asserted—that the grand jury did not include residents of Orange County, where the offense occurred—has since been withdrawn. Since, at the present time, jurors from Orange County do not go to Foley Square, this led the defendants to assume initially that they had been indicted for an Orange County crime, by a grand jury that could not have included any Orange County residents. Discovery proved this not to be the case. Additional arguments, however, have been advanced. Some of the arguments, as described below, result in factually contradictory claims of prejudice.

5. Three more northerly counties—Ulster, Greene, and Columbia—were ceded from this district to the Northern District of New York effective March 31, 1979.

lists used are those from presidential election years, which historically are the years having the highest voter registrations. As will be discussed below, however, there is a necessary time lag before the new voter registration names can be incorporated into the master jury wheel.

There are more minority persons living in the two New York City counties (New York and Bronx) than there are in the six northern counties, both in absolute numbers and in percentage of the population. In addition, as will be discussed more fully below, the minorities in question (blacks and Hispanics) apparently tend to register to vote less often than other citizens, with the result that the jury lists do not exactly mirror the population of the district.

Not all persons who are on the jury rolls are necessarily eligible for jury service. Persons who do not speak or understand the English language are disqualified. 28 U.S.C. § 1865(b)(2) & (3) (1982). This results in some Puerto Ricans (who are U.S. citizens by birth) being rejected for jury service.[6] Moreover, there is a one-year residency requirement that theoretically excludes more transient groups. *Id.* at § 1865(b)(1).[7]

## A. THE JURY PLAN FROM WHICH THE GRAND JURY WAS CONVENED

■ Initially, we will consider the defendants' claim that the grand jury panel which indicted the defendants was drawn in violation of this district's Amended Plan for the Random Selection of Grand and Petit Jurors (June 20, 1985) ("Amended Plan").[8] This grand jury panel was selected from the last reel (reel 5) of the 1980 master jury wheel, a reel containing about 3100 names. It had been filled by the court on July 15, 1985. This grand jury was impanelled on August 12, 1985. The reel used, therefore, assigned jurors to Foley Square from all eight counties in the district. Many of the upstate jurors, however, few of whom were minority persons, were assigned to the White Plains court. The effect of this was to increase the percentage of minorities in the reel used at Foley Square. For that matter, had the next year's reels based on the 1984 presidential election been used, and the matter heard in White Plains, as defendants argue should have occurred, the minority representation would have been much less. (Since the defendants argue, in their other challenges, that minorities were underrepresented on their grand jury, their argument here cuts in the opposite direction.)

The defendants argue that the intent of the amended plan was to create new master wheels for each of the courts after the next presidential election (November 1984), and that the existing wheels could only be used until that time. Since the new master jury wheels were not created until mid-

---

**6.** Aliens who are naturalized are required to take a test demonstrating their facility in English. Consequently, while some of them seek to be excused from jury service because they feel their comprehension of English is not adequate, such requests routinely are denied. Puerto Ricans, of course, are not required to take such a test. It is not uncommon for them to apply for exemption from jury service because of their lack of fluency in English. Based on personal experience, such claims usually are viewed with skepticism, particularly when received from those who have lived on the mainland for some years and who work in businesses that require some fluency in English. A certain portion of Puerto Ricans called for jury service in this district, however, are excused because of their lack of fluency in English (or claimed lack thereof).

**7.** *See infra* note 17 and accompanying text (discussing the residency requirement in greater detail).

We note parenthetically that there are additional grounds for exemption from jury service, such as public service or physical or mental infirmity, beyond the English language and residency requirements. *See generally* 28 U.S.C. § 1865(b) (1982) (outlining grounds for exemption from jury service).

**8.** An original plan went into effect on July 26, 1983. It had been approved by the Judicial Council of the Second Circuit. It was changed several times thereafter pursuant to resolution, and was amended completely effective January 20, 1984. The plan in force when the defendants' grand jury was selected was the amendment filed on June 20, 1985. The effective date, however, should not be confused with the approval date or the filing date since the later amendments kept the same effective date.

1985 and were not used until approximately September, the defendants maintain that the jury wheels being used for a period of almost a year were improper. They argue that there does not appear to be any reason why the court could not assign jurors commencing with the presidential election of 1984 consistent with the amended plan. There is a reason and it is quite obvious: namely, that mechanically it takes a period of time to transcribe the names from the presidential election voter lists and create the new master wheels. Indeed, the jury plan submitted by the defendants as an exhibit on the motion, recognizes these mechanical realities and provides that "[t]he master wheel shall be emptied and refilled by not later than September 1 following the date of each Presidential Election." Plan for Random Selection of Grand and Petit Jurors, article III(B), at 6 (Jan. 25, 1984) ("Original Plan").[9]

■ Defendants argue that there is no proof that the plan dated June 19, 1985 (and filed June 20, 1985) was ever approved by this circuit's Judicial Council. For these purposes, it has the same provisions as earlier approved by the Judicial Council. As noted above, this grand jury was selected from the 1980 presidential election voter lists as provided by the original plan (which also provided that the wheels need not be refilled until September following the presidential election), which plan was approved by the Judicial Council and went into effect on July 26, 1983.

B. *THE CLAIM THAT THE JURY ARRAY DOES NOT PRODUCE A FAIR CROSS SECTION OF THE COMMUNITY*

Defendants claim that the jury array that produced the grand jury indicting them, and possibly the jury array from which their trial jury will be selected, do not represent a fair cross section of the community in that the number of blacks and Hispanics in the array will not be as great as their numbers in the population according to the U.S. census figures. It should be noted that we are dealing with

the wheels created from the 1980 voter registration for the grand jury but that the trial jury will be selected from the 1984 voter registration wheels. The trial jury also will be selected primarily from a wheel drawn from three upstate counties, with only small portions of those drawn from the three suburban counties (Westchester, Rockland, and Putnam). All of these counties have substantially lower minority populations than do New York (Manhattan) and the Bronx, which were substantially represented in the grand jury venire. If there is a disparity in the percentage of minorities who get called for jury duty in this district, it will have had, in terms of absolute numbers, a greater impact on the grand jury than on the trial jury venire. Consequently, we will concentrate on the grand jury selection from the 1980 voter list wheels.

The voter lists themselves are of no help in determining race or ethnicity, since registrants do not disclose these matters. The defendants have, therefore, worked from juror qualification questionnaires which are sent to only a small portion of the names on the master jury wheel. As with all such matters, only a portion of those receiving the questionnaires respond. The questionnaire does request information concerning race. It lists as possible responses the following: "Black (Negro)"; "White"; "American Indian"; "Oriental"; "Other (Specify)". After the boxes for "Black (Negro)" and "White" are two small boxes into which a subdivision of "Hispanic" and "Non–Hispanic" can be made. Although most respondents do check the first box indicating race, some respondents do not move to the right to fill in the second box distinguishing Hispanics from non-Hispanics. This diminishes the accuracy of the juror questionnaires that are returned as a source of information as to the number of Hispanic jurors in the wheels. The result is some difference of opinion as to the accuracy of statistics with respect to the jury wheels.

Giving the defendants the benefit of the doubt, we will use the figures of defend-

---

**9.** The same language exists in the Amended Plan filed on June 20, 1985.

ants' expert, George P. Leyland, as they appear in Judge Motley's opinion in *United States v. Biaggi*.[10] He concluded that, under the 1980 census, 17.9% of the district's population is black. Since the jury wheel contained only 10.9% blacks, Leyland contends that 7% of the black population was not represented on the jury wheels. With respect to Hispanics, he claims that the census revealed a 13.7% population, while the jury wheel contained only 5.7%. Consequently, Leyland argues that there exists an actual disparity of 8%. In terms of persons on a grand jury, these disparities amount to 1.6 blacks and 1.8 Hispanics (rounded to the nearest tenth).[11]

The Government contests these figures rather vigorously. They point out that defendants' experts failed to eliminate from their calculations persons who responded to the questionnaires but who did not indicate their race or ethnic background. In addition, they argue the fact that the questionnaire's returners are not necessarily representative of the entire wheel, with the result that possibly a larger proportion of those who did not return the questionnaires were minorities. Other variables also are mentioned, some of which will be discussed below. The defendants contend that the actual disparity is 4.3% for blacks and 3.7% for Hispanics on the 1980 district master wheel (*i.e.*, less than one grand juror for each group).

For these purposes, we are prepared to accept the defendants' figures as to blacks. The figures with respect to Hispanics, as will be discussed below, are much more questionable.

1. *Defendants' Standing to Raise this Issue*

■ None of the defendants are black or Hispanic. There is no reason to believe that such jurors, in light of the ethnicity of the defendants and the nature of their alleged crime, would be more favorable to the defendants. Consequently, a substantial issue as to standing arises.

The defendants, citing *Duren v. Missouri*, 439 U.S. 357, 359 n. 1, 99 S.Ct. 664, 666 n. 1, 58 L.Ed.2d 579 (1979) and *Taylor v. Louisiana*, 419 U.S. 522, 526, 95 S.Ct. 692, 695, 42 L.Ed.2d 690 (1975), contend that a criminal defendant has standing to challenge exclusions resulting in a violation of the fair cross-section requirement whether or not he or she is a member of the allegedly excluded class. It would appear that their rights in this regard may depend upon which of their many claims are being considered: the Fifth Amendment claim(s) (due process and equal protection), the Sixth Amendment claim (right to a fair cross section), or the Jury Act claim. Both *Duren* and *Taylor* involved challenges under the Fourteenth Amendment to state jury systems. As Judge Motley observed in *United States v. Biaggi*, however, application of due process and equal protection standing requirements under the Fourteenth Amendment to a challenge of federal jury selection under the Fifth Amendment (where due process and equal protection coalesce) creates a conflict. *Compare Peters v. Kiff*, 407 U.S. 493, 504, 92 S.Ct. 2163, 2169, 33 L.Ed.2d 83 (1972) (holding criminal defendant has standing to challenge jury selection on Fourteenth Amendment *due process* grounds notwithstanding fact that defendant is not member of protected class allegedly excluded) *with Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977) (holding criminal defendant does not have standing to challenge jury selection on Fourteenth Amendment *equal protection* grounds unless defendant is member of protected class allegedly excluded). Judge Motley spent considerable time attempting to resolve the question.[12] Although we do not necessarily

---

**10.** Leyland appeared as an expert in both this and the *Biaggi* case. We note, however, that the figures submitted in the two cases are not completely congruent.

**11.** In dealing with the White Plains 1984 master wheel, the disparities are much less because the population from which the wheel is drawn has

far fewer minorities. The disparity for blacks amounts to 1.7% of the population and for Hispanics .5% (*i.e.*, $\frac{1}{200}$ths).

**12.** In that case, one of the defendants *was* an Hispanic, the others were not.

adopt all of Judge Motley's scholarly considerations, we do agree that it appears the defendants have standing to raise their challenge under the due process aspect of the Fifth Amendment, and perhaps under the Sixth Amendment and Jury Act claims as well. Accordingly, we will not pursue the standing issue further.

### 2. *Hispanics as a Cognizable Group*

■ The Government contends that Hispanics are not a cognizable group. Although there is some authority to support that view,[13] the Federal Government and the court on its jury questionnaire form have treated Hispanics as a cognizable group.[14] For purposes of this motion, therefore, we feel compelled to accept the proposition that Hispanics constitute a cognizable group; they are, however, an amorphous class.

To begin with, like the ancient Celts, they are a linguistic group, and not an ethnic group. Even that conclusion lacks universality, since many persons we consider "Hispanic" come from places where their native language is not Spanish.[15] Even more difficult in dealing with the identification is the fact that the classification of persons can be influenced by their own perceptions of themselves. It is doubtful that eighth-generation Americans descended from the conquistadors think of themselves as Hispanics, no matter how census statistics might classify them. There is the additional fact that many Hispanics are dark-skinned and, under the juror questionnaire mentioned above, would be expected to list themselves first as blacks and then put themselves into a sub-division of Hispanics. A juror's response to the racial-ethnic question on the questionnaire may not be the same as the census taker's classification of them.

The great majority of persons in this district who commonly are denominated as Hispanics are from Puerto Rico. Even Puerto Rico has a diverse ethnic mix and some citizens view their primary language as English and not Spanish. There is admittedly considerable homogeneity among the Puerto Ricans in this district, however, albeit not necessarily with other Hispanics. In sum, therefore, we treat Hispanics as a legally cognizable group for purposes of this motion, but one about whom accurate statistics or evaluation for these purposes is going to be difficult.

### 3. *Need the Fair Cross–Section Disparity be Intentional?*

It is the Government's position that absent intentional discrimination in compiling voter lists, no claim can be asserted by the defendants. *United States v. Guzman*, 468 F.2d 1245, 1248 (2d Cir.1972), *cert. denied*, 410 U.S. 937, 93 S.Ct. 1397, 35 L.Ed. 2d 602 (1973). We need not determine whether a showing of intentional discrimination in compiling the jury wheels is necessary, because defendants have contended that it *was* intentional. The defendants argue that using the voter registration list as a source for jurors was a known method of reducing minority jurors.[16] They also point to the fact that the Eastern District of New York and certain of the New York State courts use sources other than the voter lists since "it is commonly known that Blacks and Hispanics register to vote

---

**13.** *See United States v. Rodriguez,* 588 F.2d 1003, 1007 (5th Cir.1979) (finding plaintiff failed to meet his burden of showing that Hispanics, as opposed to Mexican–Americans, Cuban–Americans, Puerto Ricans or other similarly distinct groups, constitute a cognizable class).

**14.** Practically speaking, in this district, Puerto Ricans constitute most of the "Hispanic population." They are all citizens. Of other persons classified as Hispanics, however, it appears that most of them are not citizens and, therefore, not qualified to vote or serve as jurors. (This does not necessarily mean that they never vote or get called for jury duty, merely that they are not truly eligible for either.)

**15.** We tend to think of all immigrants from the Caribbean, Mexico, and Central and South America as being Hispanics. A number of emigres from the Caribbean Islands speak languages other than Spanish. The same is true of certain Central and South American countries, including the largest, Brazil, where Portuguese is the main language.

**16.** The reply brief for defendants, at page 19, concluded that "this Court knew or should have known of such underrepresentation; and ... this Court perpetuated and continues to perpetuate such underrepresentation."

in substantially lower proportions than white persons, and this must have been known by the Court...." Defendant's Reply Memorandum, at 23.

We must say that we find that this allegation of intentional discrimination by the court to be a bit surprising. The Chief Jury Clerk who prepared the rolls in question, George Cornelius (now retired), and the Chief Judge who approved the rolls, the Hon. Constance Baker Motley (now a Senior Judge), are both black. In order to avoid the need of an evidentiary hearing involving such issues, however, and in light of our ultimate conclusion in the matter, we will assume, for these purposes, that the jury rolls were prepared in an intentionally biased fashion.

4. *Reasons for Differences Between Minority Census Figures and Minority Voting Enrollment*

The most significant argument made by the defendants is that the Jury Act requires the use of other sources to ascertain prospective jurors whenever there is a significant difference between the presence of cognizable groups within the district and their numbers on the voter rolls. We will deal with this contention shortly, but it is appropriate to put it in context by considering the reasons why adults do not register to vote. While there are undoubtedly numerous reasons, the most common ones would seem to be:

1. alienage;
2. non-residency;
3. a general disinterest in civic matters;
4. lack of interest caused by inability to read or speak English proficiently;
5. a desire to avoid jury service.

Many of these reasons impact more strongly with respect to minorities than with the population at large. For example, according to the Government's expert, the 1980 census indicates that more than one-half of the non-Puerto Rican Hispanics in the district are not citizens and are, therefore, not eligible to vote or to be jurors. Ericksen Affidavit ¶ 27. Moreover, federal juror laws require a one-year residency in the district before being eligible for jury service.[17] Puerto Ricans, particularly, tend to be transient, going back and forth between New York and Puerto Rico. Although some who come with the intention of only working for a short period of time and then returning to their lovely land of sun and palm trees often stay much longer, they may never acknowledge the fact that they have become New York residents. Indeed, in light of the high taxes in New York,[18] there may be practical reasons for disclaiming New York residency. If one registers to vote in New York, however, such a disclaimer will not be accepted.

Officials have estimated "that there are at least 400,000 eligible Hispanic voters in New York City who are not registered and that the majority of them are Puerto Ricans."[19] As noted earlier, many Puerto Ricans are not proficient in English. Therefore, they may not read English-language newspapers or listen to English-lan-

---

**17.** The defendants argue in rebuttal that such a provision is unconstitutional. We doubt that they have standing to raise this issue and it certainly is not appropriately raised within the confines of this motion. Moreover, there is substantial authority in opposition to their position. *E.g., United States v. Ross,* 468 F.2d 1213, 1215–1216 (9th Cir.1972), *cert. denied,* 410 U.S. 989, 93 S.Ct. 1500, 36 L.Ed.2d 188 (1973); *United States v. Perry,* 480 F.2d 147, 148 (5th Cir. 1973) (per curiam). Judge Tenney ruled, without a hearing, that a criminal defendant had no standing to raise a challenge identical to the one here asserted, and further concluded that recent residents were not a cognizable group. *United States v. Huber,* 457 F.Supp. 1221, 1232 & n. 8 (S.D.N.Y.1978). In any event, practical considerations render the issue inconsequential in this case. Under New York law, a person may reg-

ister to vote after only a thirty-day residence in the relevant county, city or village. N.Y. Elec. Law § 5–102 (McKinney 1978). If such a person is then picked up on the jury rolls, that person will have been a resident for more than a year by the time called. Recall that there exists a year's lag between the time of registering to vote for a presidential election and the ultimate use of those names on the jury rolls.

**18.** Residents of this district, in addition to paying high sales taxes, must also pay a substantial New York State income tax and, if they live in the cities of New York or Yonkers, a not inconsequential city income tax.

**19.** Pitt, *Puerto Rico Expands New York Voter Drive,* N.Y. Times, Oct. 14, 1987, at B5, col. 1.

guage radio broadcasts. Although they may receive a certain amount of information concerning mainland voting matters from Spanish-speaking media, the focus may not be as strong (*i.e.*, the focus on the Spanish media usually is on politics elsewhere, such as in Puerto Rico, Latin America, or Spain). Thus, inability to understand English-language media likely contributes to the failure of New York's Puerto Ricans to register in larger numbers.[20]

In addition, we are told that poor people show less interest in civic matters and register to vote with a lesser frequency than the more affluent. Statistics also indicate that minorities are more likely to be poor than non-minorities. This may well diminish the number of black and Hispanic persons otherwise eligible who normally register to vote.

Finally, the fact that some persons do not register to vote because they want to avoid jury service is a matter which would not seem to have any disparate statistical impact on minorities. In their papers, the defendants hint at some sinister processes preventing minorities from registering to vote. We agree with Judge Motley's conclusion, however, that "Blacks and Hispanics have been and are free to increase their representation on the Master Jury Wheel simply by exercising their right to register." *Biaggi*, 680 F.Supp. at 652.

5. *The Need for Supplementing the Voter Lists*

That the Jury Act speaks of the possible use of sources other than voter lists in creating juror pools reflects Congress's concern that impediments to minority voter registration historically existed in some States. There is no proof that such is the situation in the Southern District of New York. Indeed, the contrary is true at least

in New York City where minority registration is solicited. Consequently, we are governed by the Second Circuit's conclusion that " '[t]he use of voter[ ] registration lists as the sole source of the names of potential jurors is not constitutionally invalid, absent a showing of discrimination in the compiling of such voter[ ] registration lists.' " *United States v. Young*, 822 F.2d 1234, 1239 (2d Cir.1987) (quoting *United States v. Gordon*, 493 F.Supp. 814, 821 (N.D.N.Y. 1980), *aff'd*, 655 F.2d 478 (2d Cir.1981)).[21]

In *Guzman*, the claim was made that the jury-selection procedures in this district violated the Jury Act because they resulted in underrepresentation of young people. The Second Circuit rejected this argument, stating:

In districts where obstacles are placed in the paths of certain citizens attempting to register to vote, the voting rolls must be supplemented to achieve a list reflecting a fair cross section of the community. But in the Southern District, where the asserted age group is entitled to register to vote and has done so (albeit in lower proportion than its percentage of the total population), we can find no systematic discrimination sufficient to require the use of alternative sources for jury lists.

*Guzman*, 468 F.2d at 1248. Admittedly, as with most legislation, some support can be found for the notion that the need to supplement exists whenever the voter lists do not produce jurors reasonably representative of the community from which they are drawn. In our view, however, the overwhelming thrust of Congressional intent was to ensure that discrimination in voter registration did not taint federal jury-selection procedures. *See especially Huber*, 457 F.Supp. at 1226–29 (Judge Tenney's

---

**20.** A focus of efforts with respect to minority enrollments has been to disseminate voter information in Spanish, with the hope that it will attract more Hispanic voters.

**21.** Other circuits repeatedly have rejected similar claims, whether raised under the Jury Act or the U.S. Constitution, holding that the use of voter lists themselves does not demonstrate intentional or systematic discrimination. *E.g., United States v. Lopez*, 588 F.2d 450, 451–452

(5th Cir.) (per curiam), *reh'g denied*, 591 F.2d 102, *cert. denied*, 442 U.S. 947, 99 S.Ct. 2895, 61 L.Ed.2d 319, *reh'g denied*, 444 U.S. 888, 100 S.Ct. 188, 62 L.Ed.2d 122 (1979); *United States v. Arlt*, 567 F.2d 1295, 1297 (5th Cir.) *reh'g denied*, 570 F.2d 949, *cert. denied*, 436 U.S. 911, 98 S.Ct. 2250, 56 L.Ed.2d 412 (1978); *United States v. Test*, 550 F.2d 577, 586–587 & n. 8 (10th Cir. 1976); *United States v. Freeman*, 514 F.2d 171, 173 (8th Cir.1975).

scholarly analysis of Congress's intentions in directing supplementation of voter lists).

It should also be noted that other districts that encompass populations containing identifiable racial and ethnic groups have consistently upheld the validity of jury plans relying exclusively on voter lists.[22] Moreover, as defendants' own research shows, the overwhelming majority of districts, including those encompassing Los Angeles, Chicago, Boston, Philadelphia, Houston, Dallas, Phoenix, and Atlanta, have plans comparable to the one in use in this district.

In addition, we doubt that there is any viable way of increasing minority representation by using any other representative listing of citizens. Although the defendants suggest the use of lists containing those who have driver's licenses or vehicle registrations, or telephone directories, etc., common sense indicates that these lists are economically influenced. Poorer persons (who, we have noted, are disproportionately minorities) will be disproportionately underrepresented on these alternative lists.

Defendants also suggest that we look for Spanish surnames and selectively add such persons. On its face, the legality of such an approach is highly questionable. It is fraught with the potential for discrimination given the administrative discretion it would afford. Moreover, the debatable effectiveness of this approach is easily demonstrated. The defendants' experts contend that the 1980 master wheel contained only 5.7% Hispanics. The Government's expert then analyzed the 1980 wheel, using the Spanish-surname approach suggested by the defendants. He found that *9%* of the names in the defendants' original sample of the reel used in the 1980 master wheel were recognizable as Spanish surnames—over 3% greater than the number of Hispanics in the wheel identified by defendants' expert.[23] Moreover, in analyzing those who were sent questionnaires and failed to return them, the Government's expert found that more than twice as many with Hispanic surnames failed to respond.[24] Consequently, defendants' suggested alternative for supplementation is not only fraught with the potential for discrimination, but defendants themselves appear to be ambivalent as to its effectiveness.

We know of no legally appropriate or practically effective means of increasing the number of minorities on the jury rolls except to encourage them to register to vote.

### 6. *Failure to Add Hispanic Jurors to Compensate for the English Language Exclusion*

As noted earlier, Puerto Ricans are citizens eligible to vote and, if they meet the other requirements, can serve as jurors. One factor which tends to exclude some otherwise eligible Puerto Ricans from jury service is their lack of fluency (or claimed lack) in English.[25] It does not, however,

---

**22.** *E.g., United States v. Duran de Amesquita,* 582 F.Supp. 1326, 1331 (S.D.Fla.1984); *United States v. Brummitt,* 503 F.Supp. 859, 861 (W.D. Tex.1980), *aff'd,* 665 F.2d 521, 529 (5th Cir. 1981), *cert. denied,* 456 U.S. 977, 102 S.Ct. 2244, 72 L.Ed.2d 852 (1982).

**23.** Defendants pooh-pooh this finding as inaccurate. In doing so, they seek to have it both ways on this issue. They urge supplementation of the voter lists by selecting individuals with Spanish surnames, but then dismiss the Government's findings as inaccurate when that method is employed to analyze the wheel and demonstrates Hispanic numbers greater than those reflected in the census.

**24.** This is an additional reason undermining the validity of the responses, and calls into further question the usefulness of the voluntary self-designation on the jury questionnaire. It again reinforces our view that although Hispanics may be a legally cognizable group, statistics with respect to them are necessarily suspect.

**25.** We are dealing here with something which is a matter of degree. For most Puerto Ricans, Spanish is their preferred language. Almost without exception, however, they speak some degree of English. Some Puerto Ricans seek to be excused from jury duty because they do not believe their command of English is sufficient. In some instances, this concern is valid. As a trial judge who has "purged" many juror panels and listened to a number of such claims, however, it is clear to me that in many instances the request for exclusion is invalid. Whether the request for exclusion comes from simply a desire not to serve on a jury or from a genuine but excessive concern about one's abilities in English varies from person to person.

result in any substantial underrepresentation of the number of Hispanic jurors. According to the defendants' statistics, almost one-fourth of the Hispanics on the sample wheel claimed entitlement to such disqualification. Only one-tenth were, in fact, disqualified. As defendants acknowledge, these claims of disqualification are treated rather strictly and even a minimal degree of proficiency in speaking English will suffice.

We note that there are numerous other exclusionary grounds and no attempt is made to supplement for persons excluded on those grounds. These include advanced age, health, deafness, and, most common of all, the "sole-proprietor" exclusion. If a juror can establish that his business cannot function without his presence, he or she can be excused. This probably is the most common ground asserted by jurors seeking exclusions. Based on extended personal experience in purging juries, those "sole proprietors" tend to be overwhelmingly white and middle class. No attempt is made to supplement for them. We see neither need nor requirement to supplement for the English language exclusion.

### 7. *Is the Underrepresentation of Minorities "Substantial"?*

As we have noted, numerous challenges have been made across the country to jury-selection processes. All have been unsuccessful, usually because, to the extent that underrepresentation of minority groups has been established, it has not been substantial. Since the Sixth Amendment is thought to impose the most stringent scrutiny in a jury-selection case, *Alston v. Manson*, 791 F.2d 255, 258–59 (2d Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1285, 94 L.Ed.2d 143 (1987), we consider the absolute disparities suggested by this case as our proper standard of review. *See United States v. Jenkins*, 496 F.2d 57, 65 (2d Cir. 1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975) (holding absolute disparities to be considered if Sixth Amendment case). We will use defendants' figures.

Defendants argue that if the jury lists had been completely representative there would have been two more Hispanics on the grand jury[26] and one or two more blacks. As noted earlier, the correctness of these conclusions is subject to doubt; but, even if accepted completely, we do not believe, as a matter of law, they rise to a level of substantiality sufficient to establish a constitutional or Jury Act violation. Defendants cite no case in which a court struck down a jury plan on grounds of substantial underrepresentation involving absolute disparities comparable to or less than those alleged here.

■ Consistent with the contours of Judge Motley's findings, we find as a matter of law that the disparities alleged here, to the extent they actually exist, are not of a level sufficient to implicate constitutional or statutory concerns.

### C. *THE WHITE PLAINS JURY ROLLS AS BEING DRAWN FROM A COMMUNITY*

■ With respect to their prospective trial only, the defendants contend that the method of drawing jurors for the White Plains court is contrary to 28 U.S.C. § 1869(e) (1982). That section provides that when dealing with a place of holding court in a district where there are no statutory divisions, jurors should be drawn from "counties, parishes, or similar political subdivisions surrounding the place where court is held."[27] Defendants argue that there is no "community" of Westchester, Putnam, or Rockland counties and that they do not "surround" Manhattan. They argue, therefore, that it is improper to send some of the jurors from those counties to White Plains and some of them to Manhattan.

---

**26.** The findings resulting from Judge Motley's evidentiary hearing would indicate a slightly lesser disparity in Hispanic jurors. Based on the various factors cited above, we believe the actual Hispanic disparity is probably similar to that of blacks.

**27.** It is an additional requirement that each county or political subdivision be included in one or more of the jury rolls.

The determination to send nine-tenths of the jurors from those three counties to Manhattan results from the fact that Manhattan gets a disproportionately high share of the nation's (and even the world's) litigation. Collisions between foreign-flag vessels off remote shores thousands of miles from the United States are often litigated in this district. Major corporate and securities matters having little local context are brought here. The net effect is that the City's need for jurors is proportionately in excess of its population. Consequently, jurors from other parts of the district are needed to accommodate the heavy civil-litigation burden.

The defendants' major complaint is that this has been accomplished not by a geographic distribution but by a mathematical one. Westchester, the most populous of the upstate counties in the Southern District, is the county closest to the Bronx and Manhattan; Rockland is the next closest. Conceivably, the juror need could be accommodated by sending all of Westchester's jurors and the lower half of Rockland to Foley Square. We would then have a situation where no one resident of the county where the White Plains court is located could serve on its juries. If that were done, the argument that the community requirement is being ignored would be stronger. Defendants' interpretation of the statute would require the creation of new federal courthouses whenever actual contiguity is lacking between the boundaries of a county containing a seat of the court and the boundaries of other counties.

Courts have broad latitude in defining the geographic area from which juries will be selected. There is no constitutional right to have a jury from an entire district. *Ruthenberg v. United States*, 245 U.S. 480, 482, 38 S.Ct. 168, 169, 62 L.Ed. 414 (1918); *United States v. Herbert*, 698 F.2d 981, 984 (9th Cir.), *cert. denied*, 464 U.S. 821, 104 S.Ct. 87, 78 L.Ed.2d 95 (1983); *United States v. Young*, 618 F.2d 1281, 1288 (8th Cir.), *cert. denied*, 449 U.S. 844, 101 S.Ct. 126, 66 L.Ed.2d 52 (1980); *United States v. Florence*, 456 F.2d 46, 50 (4th Cir.1972). Juries may be selected exclu-

sively from certain geographic areas, such as the division or counties located nearest the courthouse. *Zicarelli v. Dietz*, 633 F.2d 312, 315–320 (3rd Cir.1980), *cert. denied*, 449 U.S. 1083, 101 S.Ct. 868, 66 L.Ed. 2d 807 (1981). A court is not required to concentrate its jury selection within the particular division, county or city where the trial will take place or where the defendant resides. *Savage v. United States*, 547 F.2d 212, 216 n. 8 (3rd Cir.1976), *cert. denied* 430 U.S. 958, 97 S.Ct. 1608, 51 L.Ed.2d 810 (1977).

No authority is cited for the proposition that dividing jurors from a given county and sending part to one courthouse and part to another prevents these areas from being communities. Under the statute, a district court is given discretion in determining the allocations of jurors from the counties or similar political subdivisions.

The Second Circuit repeatedly has rejected attempts to assert any constitutional prohibition or limitation on a court's powers rationally to administer or delineate jury divisions within districts. *United States v. Kelly*, 349 F.2d 720, 779 (2d Cir. 1965), *cert. denied*, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966); *United States v. Titus*, 210 F.2d 210, 212–13 (2d Cir.1954); *United States v. Gottfried*, 165 F.2d 360, 363–65 (2d Cir.), *cert. denied*, 333 U.S. 860, 68 S.Ct. 738, 92 L.Ed. 1139, *reh'g denied*, 333 U.S. 883, 68 S.Ct. 910, 92 L.Ed. 1157 (1948).

Courts that have considered the cognizability of populations solely on the basis of their residence in a particular geographic area also have rejected such claims. *Zicarelli*, 633 F.2d at 318–20; *United States v. Foxworth*, 599 F.2d 1, 48 n. 4 (1st Cir.1979); *United States v. Butera*, 420 F.2d 564, 572 (1st Cir.1970); *Titus*, 210 F.2d at 212–13; *Gottfried*, 165 F.2d at 363–65. *Cf. Gruberg*, 493 F.Supp. at 248–51 (Conner, J.) ("not clear" that Orange, Dutchess, Sullivan, and Putnam Counties, together, were cognizable).

Defendants also contend that the disparity of minorities in the jury lists will also exist in the White Plains wheel because of the use of the voter rolls. Since the per-

centage of minorities in this portion of the district is substantially less, the disparities in absolute numbers, as noted above, will be substantially less than with respect to the Foley Square grand jury. Since we have found there to be no substantial underrepresentation with respect to the grand jury at Foley Square, it follows that we reject the same claim as it applies to the White Plains jury lists.

## CONCLUSION

For all of the reasons set forth above, the defendants' motion is denied in its entirety. Since this motion has substantially delayed the trial of this case, a prompt pretrial conference will be held on Wednesday, April 6, 1988, at 9:45 a.m. to complete the preparation of the case for trial.

SO ORDERED.